2000-NMCA-020

995 P.2d 1060

STATE of New Mexico, ex rel. CHILDREN, YOUTH AND FAMILIES DEPARTMENT, Petitioner–Appellee,

v.

ANNE McD., f/k/a Anne L., Respondent–Appellant.

In the Matter of Megan L., a child.

No. 19449.

Court of Appeals of New Mexico.

Feb. 15, 2000.

Angela L. Adams, Chief Children's Court Attorney, Roy E. Stephenson, Children's Court Attorney, Santa Fe, for Appellee.

Jane Bloom Yohalem, Santa Fe, for Appellant.

*OPINION*

ARMIJO, Judge.

{1} Upon a motion filed by the Children, Youth and Families Department pursuant to NMSA 1978, §§ 32A–4–28 and 29 (1997), the parent-child relationship was terminated between Anne L. (Mother) and Megan L. (Child), her daughter born on June 22, 1985. Mother presents two issues for consideration. First, she contends that her procedural due process rights were violated when the Children's Court allowed six out of seven of the Children, Youth and Families Department's (CYFD, or the Department) witnesses to appear by telephone. The second issue is whether the motion to terminate parental rights should have been dismissed because the trial was not held within the time prescribed by NMSA 1978, § 32A–4–29(H) (1997). Determining there were no violations of time requirements or Mother's procedural rights to due process and further determining that the judgment terminating her parental rights is supported by clear and convincing evidence, we affirm the judgment of the Children's Court.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *THE UNDERLYING NEGLECT/ABUSE PROCEEDING*

{2} On August 28, 1995, CYFD received a referral that Child had been sexually abused by her stepfather. CYFD took emergency custody of Child on August 30, 1995. On September 5, 1995, CYFD filed a petition therein alleging that Child had been neglected and/or abused by Mother and stepfather. An adjudicatory hearing was scheduled for December 8, 1995. On that date, Mother and her stepfather waived their respective rights to a trial and advised the court that they would not contest the allegations of the petition. Mother admitted that Child had been subjected to sexual abuse by the stepfather. On January 18, 1996, the Children's Court formally entered judgment adjudicating Child as abused. The Court found that Mother was not aware that the sexual abuse was occurring. Also, on December 8, 1995, a dispositional hearing was held, and on February 19, 1996, the Children's Court formally entered its dispositional order.

{3} The following treatment plan was adopted by the court as a part of its disposition: (1) Child was to remain in the custody of CYFD; (2) Child was not to be returned to an environment that included the stepfather until he completed sex offender treatment and until Child's therapist and social worker gave approval; (3) Mother was to participate in individual therapy to address issues deemed appropriate by her therapist. Therapy was to be provided by a therapist skilled in sexual abuse issues and approved by CYFD; (4) Child was to be referred to treatment foster care; (5) Mother was to participate in family therapy with Child only as deemed appropriate by the treatment team; (6) any visits between Mother and Child were to be supervised and at the discretion of CYFD; and (7) Child was to have no physical or verbal contact with her stepfather.

### *Mother's Compliance with Treatment Plan*

{4} Doctor Marc Caplan performed the initial psychological evaluation of Mother in October 1995. At that time, she advised him that she did not need therapy. Doctor Caplan noted that Mother was more concerned with her relationship with her husband (the abuser) than with Child.

{5} On October 27, 1995, Child was admitted to the acute care unit of Children's Psychiatric Hospital in Albuquerque. Her behavior included the following: self-injurious behavior; sexually-inappropriate behavior; suicidal ideation; physical aggression; oppositional behavior; and hording of food and eating out of the trash. Child remained in the acute care unit of Children's Psychiatric Hospital until December 11, 1995, when she was transferred to a residential unit within the hospital. She remained in a residential treatment unit until April 12, 1996, when she was discharged into a therapeutic foster care setting.

{6} While Child was in Children's Psychiatric Hospital, Mother participated in weekly visits and family therapy. During Mother's first visit, Child became out of con-

trol and Mother had to be escorted off the premises. During other visits, Mother told Child that she should not talk about the sexual abuse issues and was generally negative toward therapy, advising Child it was a family issue that should be dealt with within the family.

{7} In April 1996, after Child's discharge from Children's Psychiatric Hospital and placement in therapeutic foster care, Mother was required to wait sixty days before any contact with Child. Two weeks after Child's discharge, Mother announced that she was moving to the Wyoming–Montana border because she obtained employment near there. She directed that any contact be arranged through her father in Alamogordo, New Mexico, CYFD advised Mother of Child's mailing address and stated that funds were available for visitation if she requested.

{8} In December 1996, Melissa Lippold, treatment coordinator for Namaste, the Child's therapeutic foster care program, met with Mother after Mother expressed an interest in establishing contact with her daughter. Mother was presented with a letter from Child, stating that Child did not wish to see her. Among the reasons cited were Mother's refusal to begin therapy, her continued relationship with the stepfather, and her refusal to talk to Child about the abuse that Child had endured.

{9} In December 1996, Mother entered into therapy with a CYFD-approved therapist to address her own issues regarding abuse as well as the current situation. According to Mother's therapist, progress was slowly being made. In June and July 1997, there were two supervised visits between Mother and Child. During the visits, Mother and Child became very secretive. Thereafter, Child refused to talk about issues with the therapist, stating that it was "private stuff." Child's foster mother reported that Child's behavior worsened, becoming controlling and angry.

## II. *THE TERMINATION PROCEEDING*

{10} A motion to terminate parental rights was filed on July 15, 1997, some two years after the initial placement of Child into the Department's custody. The motion alleged that Child was abused and that the causes and conditions of abuse were unlikely to change in the foreseeable future despite reasonable efforts by CYFD to assist Mother in overcoming the conditions which led to the abuse. Trial on the merits was scheduled to be held at the Grant County Courthouse in Silver City, New Mexico. Silver City is located in the extreme southwest part of the state. CYFD sought to elicit trial testimony of six of its seven witnesses, telephonically, pursuant to NMSA 1978, § 32A–1–18(E) (1995). These witnesses resided or were located in northern New Mexico: Dolores Herr, Child's current therapeutic foster mother who resided in Questa; Pamela Naugle, Child's first therapeutic foster mother who resided in Los Alamos; Melissa Lippold, Child's Namaste treatment coordinator who was based in Espanola; Sharon Lewis Chacon, Child's therapist who was also based in Espanola; and Nancy Futran, a clinical social worker who oversaw Child's treatment while she was receiving in-patient treatment at Children's Psychiatric Hospital based in Albuquerque. Doctor Marc Caplan, who performed the initial psychological evaluation of Mother in 1995, was currently based in Las Cruces. The one witness CYFD was to have physically available in the courtroom was Susan Mills, the social worker in charge of the case. Mother did not subpoena any of these witnesses.

{11} Mother objected to the proposed telephonic testimony. At the hearing on the objections held on November 25, 1997, the Department argued that it would be "convenient" for its witnesses if they could appear by telephone. After considering Mother's objections, the Children's Court ruled that although telephone testimony was not the ideal means of receiving testimony at the termination trial, allowing the testimony was not inconsistent with Mother's rights under the circumstances because Mother had not demonstrated any prejudice. The court did, however, reserve the right to revisit and reconsider the matter as the trial proceeded. Mother did not raise the matter further during the course of the trial.

{12} At that same hearing, Mother moved to dismiss the petition, contending

that NMSA 1978, § 32A–4–29(H) (1997) required that the hearing on the motion to terminate parental rights be held between thirty and sixty days after service of the motion on the interested parties, and that the requirement was violated. She requested that the motion to terminate be dismissed without prejudice. She also argued that the trial should be conducted in a forum closer to her place of residence, that of Child, and the majority of witnesses. The trial court denied the motion, finding that the time limit contained in the statute did not apply because the abuse and neglect petition was filed prior to the effective date of the statute and further finding that if it were to dismiss the motion and force CYFD to refile, the matter could not be scheduled until late spring or mid to late summer and it would be in Child's best interest to hold the hearing as soon as possible.

## DISCUSSION

■ {13} We note for purposes of our review that Mother does not directly challenge the sufficiency of the evidence in support of the termination of her parental rights. And, although this is therefore not an issue before us, we nonetheless elect to review the evidence presented at trial because of the specific nature of Mother's due process claims. In undertaking such a review, we are mindful of the requisite standard of proof to be applied: whether the grounds relied upon by the Children's Court have been proven by clear and convincing evidence. *In re Termination of Parental Rights of Eventyr J.*, 120 N.M. 463, 466, 902 P.2d 1066, 1069 (Ct.App.1995); *see also* NMSA 1978, § 32A–4–29(J) (1997). We will not reweigh the evidence, but will view it in a light most favorable to affirmance. Upon our review, we conclude that the judgment of termination was supported by clear and convincing evidence.

*Issue 1: Procedural due process and the telephonic testimony.*

{14} Upon receipt of the Department's Notice of Intent to Elicit Telephone Testimony, Mother filed an objection, therein asserting that:

Given the importance of this proceeding to Respondent, which importance is, of course that if the Department's motion is granted, the result will be an absolute termination of any and all connections between Respondent and her only child, Respondent believes that she should have the right to have the witnesses the Department intends to use in support of its motion be personally present so that their demeanor, body language, and other physical aspects of their testimony will be available.

Mother also noted the possibility that some of the Department's witnesses would be called by her as rebuttal witnesses and noted the impracticality of doing so if they were not physically present in court.

■ {15} The first issue raised by Mother concerns a question of law relating to due process. However, it also involves a review of the exercise of discretion by the Children's Court in allowing all but one of the Department's witnesses to testify by telephone. Because the issue ultimately is whether the Children's Court deprived Mother of due process protection, it is a question of law that we review de novo.

{16} Section 32A–1–18(E) provides as follows:

In any proceeding under the Children's Code, the court may allow a party or witness to the proceeding to participate by the use of electronic communications, consistent with the rights of all parties to the proceeding and pursuant to rules promulgated by the supreme court.

{17} Our Supreme Court has not promulgated rules addressing testimony by electronic communication in the context of proceedings under the Children's Code. Therefore, in the absence of such rules, the guiding principles are the rights of the parties and the interests at stake.

■ {18} In a termination of parental rights proceeding, we analyze the due process standards in accordance with the factors established by the United States Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). We consider:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural, safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*See State, ex rel. Children, Youth and Families Dep't v. Ruth Anne E.,* 1999–NMCA–035, ¶ 21, 126 N.M. 670, 974 P.2d 164.

{19} As for the private interests at stake here, this Court has recognized the long-standing principle that procedural due process must be provided to parents in termination of parental rights proceedings. *See Ruth Anne E.,* 126 N.M. 670, 974 P.2d 164, 1999–NMCA–035, ¶ 19; *see also Santosky v. Kramer,* 455 U.S. 745, 753–54, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ("[P]ersons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.").

{20} Several jurisdictions have undertaken consideration of an issue similar to the one before us, but these cases are of little assistance because those jurisdictions' codes, unlike our Children's Code, do not specifically allow the use of testimony by electronic communication. *See State ex rel. Juvenile Dep't v. Gates,* 86 Or.App. 631, 740 P.2d 217 (1987) (discussing testimony by electronic communications); *In re Heller,* 669 A.2d 25 (Del.1995) (discussing testimony by communications).

{21} There is, however, one jurisdiction that has recognized six important functions that are served by requiring a witness' personal appearance. *See Bonamarte v. Bonamarte,* 263 Mont. 170, 866 P.2d 1132, 1134 (1994) (setting out the six important functions). Requiring a witness to testify personally at trial serves a number of important policies and purposes. A witness' personal appearance in court:

1. assists the trier of fact in evaluating the witness' credibility by allowing his or her demeanor to be observed firsthand;

2. helps establish the identity of the witness;

3. impresses upon the witness, the seriousness of the occasion;

4. assures that the witness is not being coached or influenced during testimony;

5. assures that the witness is not referring to documents improperly; and

6. in cases where required, provides for the right of confrontation of witnesses.

We believe that consideration of these functions can assist a children's court in determining whether the allowance of testimony via electronic communication falls within the due process standards established in *Mathews,* 424 U.S. at 335, 96 S.Ct. 893. *See also In re Ruth Anne E.,* 1999–NMCA–035, ¶ 21, 126 N.M. 670, 974 P.2d 164 (adopting the *Mathews* analysis).

{22} "[P]rocedural due process is a flexible right and the amount of process due depends on the particular circumstances of each case." *Ruth Anne E.,* 1999–NMCA–035, ¶ 17, 126 N.M. 670, 974 P.2d 164. The private interest affected in this case is one of constitutional proportions. Our United States Supreme Court has consistently recognized that the parent-child relationship is one " 'of basic importance in our society' ... sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.,* 519 U.S. 102, 116, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). Due to the nature of the interest, the procedures used must be carefully scrutinized. What might constitute due process when lesser rights are involved, might not constitute due process when the state seeks to terminate parental rights. In *Ruth Anne E.,* 1999–NMCA–035, ¶ 19, 126 N.M. 670, 974 P.2d 164, this Court reiterated the requirement that in termination of parental rights proceedings, the actions must be conducted with "scrupulous fairness." *See also State, ex rel., Children, Youth and Families Dep't*

*v. Joe R.*, 1997–NMSC–038, ¶ 29, 123 N.M. 711, 945 P.2d 76.

{23} The State undoubtedly has a compelling and vital interest in protecting the welfare of children. *See Ruth Anne. E.*, 1999–NMCA–035, ¶ 23, 126 N.M. 670, 974 P.2d 164; *Ridenour v. Ridenour*, 120 N.M. 352, 355, 901 P.2d 770, 773 (Ct.App.1995). The statute authorizing termination mandates that in determining whether to terminate parental rights, the trial court "give primary consideration to the physical, mental and emotional welfare and needs of the child, including the likelihood of the child being adopted if parental rights are terminated." NMSA 1978, § 32A–4–28(A) (1999). *See also In the Matter of Adoption of Francisco A.*, 116 N.M. 708, 714, 866 P.2d 1175, 1181–82 (Ct.App.1993) ("It is well established in New Mexico that parents do not have absolute rights in their children; rather, parental rights are secondary to the best interests and welfare of the children."). *In re Samantha D.*, 106 N.M. 184, 186, 740 P.2d 1168, 1170 (Ct.App.1987).

{24} In balancing the parent's rights and interest and the State's rights and interest in the case before us, the determinative factor is the second prong of the *Mathews* test: whether the procedures used increased the risk of an erroneous deprivation of that interest and whether additional safeguards would eliminate or lower that risk. As the Court noted in *Mathews*, 424 U.S. at 343–44, 96 S.Ct. 893, the risk of error is greater when "issues of witness credibility and veracity . . . are critical to the decision making process" as compared to when the court is faced with objective evidence that the court must interpret and apply. When a witness is in the courtroom testifying, the judge has the opportunity to observe the witness and make a determination as to his or her credibility. When a witness testifies by telephone, the judge is unable to determine what, if any, reports or other documents the witness has before him or her and whether the witness is relying upon those documents. The trial judge cannot tell who is in the room when the witness is testifying and whether the witness is being coached. In these circumstances, there is a risk that a judge may lose some control over the presentation of testimony and course of the trial.

{25} The credibility of the witnesses who testified via electronic communication was never challenged, their identity never came into question, nor does the record reflect any doubt as to the witnesses' understanding of the seriousness of the occasion. Consequently, the first three functions articulated in *Bonamarte* were not at risk of infringing on Mother's due process rights. Functions 4 and 5 were also never raised or challenged by Mother. Function 6 appears to be the one Mother relies on most in her claim that her due process rights were violated.

{26} We, therefore, examine Mother's cross-examination of the witnesses to determine whether she was provided the right to confrontation of witnesses. Doctor Marc Caplan testified as to his interview with Mother once, approximately two years prior to the hearing, and as to a battery of tests he administered to her. He testified that Mother admitted to him that she was aware that her husband had previously sexually abused another stepchild from a prior marriage. Doctor Caplan noted that Mother expressed her view that her husband had "paid his dues to society." Dolores Herr testified as to Child's current behavior, the progress Child made since being placed in her home, and the impact that Mother's two visits had on Child; Melissa Lippold testified as to the treatment plan that was in place for Child up until May 1997. She testified that she has had limited contact with Mother. She further testified regarding Child's desires as expressed in a letter and what the treatment team agreed was in Child's best interest. Nancy Futran testified regarding why Child was admitted into the hospital, how long Child was at the hospital, the nature of Mother's participation in family visits while Child was in the hospital, and Mother's attitude at that time toward therapy. Pamela Naugle testified about Child's behavior while Child was in her home. Sharon Lewis Chacon testified to Child's progress in therapy, the issues that Child was working on, the severity of Child's emotional problems, the negative impact the visits with Mother had on Child, and her recommendation as to Child's best interests.

The only witness for the Department who testified in person was Susan Mills, the Department's social worker who was the coordinator for the case. Mother's therapist also testified in person.

{27} Upon our review of the testimony of the foregoing witnesses who testified by telephone, we determine that the use of telephonic testimony did not increase the risk that Mother was erroneously deprived of her parental rights. We observed that Mother's cross-examination of Nancy Futran and Pamela Naugle was extremely limited. Doctor Caplan testified regarding his assessment of Mother based upon his meeting with her two years prior to the hearing. Mother's cross-examination of him was focused on the fact that the evaluation and assessment were done two years prior to the hearing, and that changes had occurred in her life since that time. In the context of this testimony, we do not see how Dr. Caplan's absence from the courtroom increased the possibility of an erroneous deprivation. Similarly, Dolores Herr's factual testimony regarding Child's current behavior and the negative impact the visitation with Mother had upon Child was not strongly contested by Mother. Under these circumstances, we do not view Herr's credibility and veracity to be at issue in the decision-making process.

{28} The testimony of Melissa Lippold, treatment coordinator at Namaste, and Sharon Lewis Chacon, Child's therapist, merit scrutiny. Lippold's testimony consisted of who was a member of the treatment team and what her role was in the treatment team. The witness also testified that during the one-year period she was treatment coordinator for Child, she only had two contacts with Mother, one by telephone on November 25, 1996, and one in person on December 12, 1996 when Mother met with the entire treatment team. According to the witness, Mother initiated that contact in an attempt to arrange visitation with Child. Prior to that, there had been no request for visitation by Mother, and there had been no contact by Mother with the Department since Child was released from Children's Psychiatric Hospital. The witness testified as to Mother's demeanor during the two-hour December 12,

1996 meeting. According to the witness, Mother portrayed herself as a victim of what happened between Child and the stepfather. She expressed anger that as a result of her husband's legal troubles and these incidents, she was experiencing financial problems. Mother also displayed a great deal of anger toward the Department. The witness also testified regarding Child. According to the witness, Child was in the top ten percent of the most difficult children to parent. She testified about Child's emotional problems, problems with anger, and problems relating to others.

{29} On cross-examination, Mother did not challenge Lippold's evaluation of Mother's demeanor at the one meeting they did have, nor did she challenge the witness' testimony regarding Child's difficulties. Instead, the focus of Mother's inquiries was on why Mother, and/or her therapist, were not part of the treatment team. Mother's cross-examination elicited additional information regarding Mother's involvement with the Department. The witness testified that Mother had no contact with her until November, 1996 and Mother's whereabouts were unknown. The witness also testified that the treatment team decided that Mother's therapist and Child's therapist should converse. When asked why Mother's therapist was not included on the treatment team, the witness responded that the focus of the team is on Child and Child's needs. The treatment team's purpose and goal is not to determine what should happen in the case as a whole, but rather how Child was doing and what treatment was appropriate. It was the witness' opinion that her job was to act as a liaison and coordinate Child's treatment. The question of whether Mother's therapist should join the team, and whether family therapy was appropriate was left to Child's therapist. Notably, Mother did not challenge the witness' testimony on these matters.

{30} Our review of the record reveals that Mother was able to effectively cross-examine Lippold. Moreover, Mother did not challenge the witness on the two most important factual issues raised by the witness, namely Mother's demeanor and attitude in

the December, 1996 meeting and Child's emotional needs and problems. In the context of this witness' testimony, the question becomes whether the risk of deprivation of Mother's rights was increased by the witness' absence from the courtroom or whether the court imposed sufficient safeguards in allowing telephonic testimony such that Mother's rights were protected. Our review of the record reveals that Mother's ability to effectively cross-examine the witness was not hampered because the witness appeared by telephone.

{31} The other witness whose testimony merits discussion is Child's therapist, Sharon Lewis Chacon. Chacon's testimony detailed the severity and nature of Child's problems and how best to address those problems. She testified as to the effect that Mother's two visits with Child had upon Child's progress in therapy, and as to the appropriateness of family therapy and further attempts at reunification with Mother. Ultimately, testimony from this witness bears on the determination of Child's best interest and whether reunification with Mother is feasible in the foreseeable future. The witness testified on direct examination that after the two visits Mother had with Child, the progress in therapy came to a halt. It appeared that Mother told Child that she was not to discuss issues with her therapist or her treatment team members and that Child was not to trust her therapist or her treatment team members. The witness testified that from a therapeutic stand point, it was in Child's best interest for Mother's parental rights to be terminated.

{32} On cross-examination, Mother challenged the witness' conclusions and challenged the witness' opinion that family therapy was not appropriate in this case based upon Child's reaction after the two visits and what had occurred during family therapy when Child was hospitalized at Children's Psychiatric Hospital. During cross-examination, Mother never challenged any factual testimony. What was at issue was the witness' opinion based upon facts which were not in dispute. Moreover, Mother's therapist was in the courtroom when Chacon testified and was, therefore, able to directly respond to Child's therapist's testimony and to challenge Chacon's conclusions. As noted earlier, Susan Mills, the social worker in charge of coordinating the case, testified in person.

{33} Upon our review of the absent witnesses' testimony, we determine that Mother's rights to procedural due process were not violated. For example, we note the unrestricted opportunity given to Mother for cross-examination, the court's directive that CYFD make them available for rebuttal, the court's willingness to reassess and reconsider the matter throughout the course of the trial, Mother's failure to demonstrate that credibility and veracity with respect to any witness were critical issues requiring their personal presence, Mother's failure to demonstrate the absence of necessary procedural safeguards, and Mother's failure to demonstrate other undue prejudice.

{34} We further conclude that the Children's Court acted well within its discretion and the bounds of due process when it permitted the witnesses to testify via telephone. The procedures utilized did not deprive Mother of procedural due process.

{35} In so holding, we emphasize the importance of a parent's right to procedural due process prior to termination of the parent-child relationship. Whenever a party requests permission to elicit telephone testimony from its witnesses in termination of parental rights cases, the trial court shall be guided in the future by the criteria which we approvingly adopt today from *Bonamarte.* In addition, before such testimony can be elicited, over objection, in termination proceedings, the Children's Court shall state in the record the reasons why telephonic testimony is to be allowed and shall explain why the use of such testimony will not prejudice a party's rights and will not lead to an increased risk of deprivation of a parent's rights to procedural due process. Because of due process concerns, it is important both for the trial court's careful use of electronic testimony in lieu of a witness' presence in court, and for our review on appeal, that the trial court state those findings on the record after giving the parties full opportunity to argue their positions.

*Issue 2: Failure to hold the termination hearing within sixty days of service of the motion on the interested parties, as required by NMSA 1978, § 32A–4–29(H) (1997), does not mandate dismissal.*

{36} The motion to terminate parental rights was filed on July 15, 1997. On July 31, 1997, Mother filed a response to the motion. CYFD filed a request for setting on August 15, 1997, indicating that the hearing needed to be held as soon as possible. The hearing was scheduled for December 5, 1997. Mother filed a motion for dismissal and refiling or for a change of venue on August 26, 1997, and filed a pleading entitled "DISAGREEMENT WITH TIME ESTIMATE FOR TPR HEARING." The hearing was rescheduled for December 3, 1997. The hearing on the motion to terminate did not occur within the sixty days as contemplated by statute.

{37} Section 32A–4–29(H) (1997) states as follows:

When a motion to terminate parental rights is filed, the moving party shall request a hearing on the motion. The hearing date shall be at least thirty days, but no more than sixty days, after service is effected upon the parties entitled to service under this section.

{38} The statute does not provide for a remedy in the event that a hearing is not held within sixty days of service on all interested parties. In contrast, NMSA 1978, § 32A–4–19(D) (1997), which establishes the time limits for the commencement of adjudicatory hearings in abuse and neglect proceedings, specifically states that "[w]hen the adjudicatory hearing on any petition is not begun within the time period specified in Subsection A of this section or within the period of any extension granted, **the petition shall be dismissed with prejudice.**" (Emphasis added.) *See also* Rule 10–308(D) NMRA 1999, which mandates a dismissal of an abuse and neglect petition, if the adjudicatory hearing is not held in a timely manner. In other proceedings under the Children's Code, the applicable rules mandate a dismissal of the proceedings if hearings are not timely held. *See* Rule 10–226 NMRA 1999 (failing to hold the adjudicatory hearing in juvenile proceedings within the time specified in the Rule or within the time granted by extension requires dismissal of the petition with prejudice). There is no comparable provision regarding termination proceedings.

{39} As we noted in *State ex rel. State Engineer v. Lewis*, 121 N.M. 323, 325, 910 P.2d 957, 959 (Ct.App.1996), "the Court will read the requirements of one portion of a statute into the requirements of another portion only where there is no plausible reason for the difference under the two statutory provisions." We believe there is a plausible reason why the legislature would deem dismissal with prejudice of the neglect and abuse petition appropriate if the adjudicatory hearing is not held within the specified period of time, and would not feel it appropriate to dismiss either with prejudice or without prejudice the termination proceeding if it is not held within the specified period of time. In the former, there has not yet been a finding that the child is abused or neglected while, in the latter, there has been a finding that Child was neglected and abused and, therefore, returning Child to the individual found to have neglected or abused Child might put Child in jeopardy.

{40} "Our main goal in statutory construction is to give effect to the intent of the legislature. To accomplish this goal, we look to the 'object the legislature sought to accomplish and the wrong it sought to remedy.'" *Archer v. Roadrunner Trucking, Inc.*, 1997–NMSC–003, ¶ 7, 122 N.M. 703, 930 P.2d 1155. (Citations omitted.) Prior to the amendment of Section 32A–4–29(H), the only requirement was that the hearing on the motion to terminate parental rights did not occur prior to thirty days after service of the motion on all parties. We assume, without deciding, that the purpose of this provision was to allow the parties sufficient time to prepare for the hearing. In 1997, the legislature added the provision that the hearing should occur no later than sixty days after service of the motion. The purpose of this provision is to ensure that the termination proceedings take place in a relatively timely manner, consistent with the best interests of the child. Therefore, as a general matter, a child's best interests include his or her re-

turn to a permanent family setting where the allegations in support of termination are unproven, or where the allegations are proven, the child's adoption or permanent placement. As this Court noted in *In the Matter of Eventyr J.,* 120 N.M. at 471–72, 902 P.2d at 1074–75, "[t]here is little that can be as detrimental to a child's sound development as uncertainty ... especially when such uncertainty is prolonged.... [C]hildren should not be kept indefinitely in a 'holding pattern.'" Requiring that a motion be dismissed without prejudice serves no practical purpose since it would only lead to a subsequent refiling of the motion and further delays. We, therefore, conclude that failure to hold the termination of parental rights hearing within sixty days as required by Section 32A–4–29(H) does not mandate a dismissal of the motion to terminate parental rights.

## CONCLUSION

{41}  Upon review of the record, we conclude that the Children's Court did not deny procedural due process to Mother. The Children's Court's finding of abuse as a basis for terminating the parent-child relationship and its finding as to reasonable efforts are supported by clear and convincing evidence. The court did not abuse its discretion in permitting the hearing to occur outside of the time limit prescribed by the statute.

{42}  Accordingly, the judgment terminating the parent-child relationship between Mother and Child is affirmed.

{43}  **IT IS SO ORDERED.**

APODACA and SUTIN, JJ., concur.