This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-38177

**STATE OF NEW MEXICO ex rel.
CHILDREN, YOUTH & FAMILIES
DEPARTMENT,**

Petitioner-Appellee,

v.

**DEANNA C.,**

Respondent-Appellant,

and

**ANTHONY B.,**

Respondent,

**IN THE MATTER OF ANTOINETTE B.,**

Child.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Marci E. Beyer, District Judge**

Children, Youth & Families Department
Rebecca J. Liggett, Chief Children's Court Attorney
Robert Retherford, Children's Court Attorney
Santa Fe, NM

for Appellee

The Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant

Jennifer L. Munson
Las Cruces, NM

Guardian Ad Litem

## DECISION

**MEDINA, Judge.**

**{1}**     Deanna C. (Mother) appeals the termination of her parental rights to Antoinette B. (Child). For the reasons that follow, we affirm.

## BACKGROUND

**{2}**     On July 14, 2016, the Children, Youth and Families Department (CYFD) filed a petition alleging Child, approximately seven months old at the time, was abused and neglected by Mother and Child's father (Father). On October 11, 2016, Mother pleaded no contest to "knowingly, intentionally, or negligently plac[ing Child] in a situation that may endanger . . . [C]hild's life or health, pursuant to [NMSA 1978,] Section 32A-4-2(B)(4) [(2009, amended 2018),]" the factual basis was that Mother continued to allow Father to reside in the same home with Mother and Child after Father hit Child. The district court ordered CYFD to implement a court-approved treatment plan, which included: participating in a parenting program in order to improve Mother's ability to meet Child's emotional, medical, and psychological needs; attending Child's health-related appointments; maintaining appropriate and stable housing "free from danger to [C]hild and from any person who has not addressed the issues that led to CYFD custody"; staying in regular contact with CYFD and service providers; and participating in regular visits with Child. The treatment plan also required Mother to follow recommendations made after completing psychological and domestic violence evaluations. Additionally, the treatment plan required Mother and Child to participate in an "Infant Mental Health Program."

**{3}**     The district court placed Child in the legal custody of CYFD, which in turn placed Child in the foster care of an unrelated couple (Foster Parents) who were also caring for one of Child's siblings. After Mother tested positive for cocaine in November 2016, her treatment plan was amended to additionally require her to complete a substance abuse program and submit to regular drug tests. The amended treatment plan also required Mother to participate in individual, group, and family counseling to address Mother's issues with mental health and domestic violence.

**{4}**     On June 8, 2017, CYFD filed a motion to terminate Mother's parental rights to Child, alleging Mother was unwilling to utilize or benefit from the services CYFD attempted to offer her. At the termination of parental rights (TPR) hearing held on November 26 and 27, 2018, the court heard the following testimony.

**{5}** Breckon Patch, a licensed clinical social worker specializing in infant mental health at Amistad Family Services (Amistad), testified about her work with Mother and Child. Patch began working with Mother and Child in September 2016. Patch would meet with Mother and Child in dual sessions and then meet one-on-one with Mother in "collateral sessions" to process and reflect on the dual sessions.

**{6}** Patch and Mother initially got along, but sometime in early 2018, the relationship deteriorated when Patch started making recommendations with which Mother disagreed. Mother became hostile in sessions: yelling, using profanity, and leaving early. This led to Amistad's decision to stop Mother's collateral sessions in April or May 2018, offering to resume the sessions when Mother was ready. Although Mother did not want to continue working with Patch, the infant mental health team at Amistad decided against changing therapists because Child felt safe with Patch. Nor could Amistad offer any alternative services to make up for the missed collateral sessions because they were dependent on analyzing the dual sessions.

**{7}** While Mother stopped her collateral sessions, she continued to have dual sessions with Patch and Child. Amistad attempted to work around Mother's requests concerning the dual sessions. For instance, when Mother voiced concern that Patch was interfering with her interactions with Child, Patch gave Mother more opportunities to work with Child without intervention. At one point, Patch also agreed to videotape the dual sessions, instead of directly participating, and meet with Mother on a separate day to review the tapes.

**{8}** Patch believed she offered the services necessary for Mother to reach the goal of being able to safely care for Child. Child had difficulty regulating her emotions, resulting in difficulty sleeping, disassociating, and becoming aggressive. In order to help Child regulate her emotions, Mother had to regulate her own emotions and learn how to mediate Child's symptoms. Child made progress in therapy, but Patch observed Child regress when she interacted with Mother. When she was with Mother, Child would become aggressive or avoidant. Patch attributed this to stress and a lack of regulation provided by Mother. Although Mother made some initial progress, Patch did not believe Mother was able to make "nearly enough" progress to safely care for Child, who had greater needs than other children her age. Patch believed Mother was unable to make progress due to her history of trauma and mental health issues.

**{9}** Anna Vendrely, Patch's supervisor and a licensed clinical social worker with Amistad, testified about her observations of Child's interactions with Mother and Foster Parents. In November 2017 Vendrely performed a videotaped assessment of Mother and Foster Parents in which she observed them interact with Child during a series of activities that became increasingly difficult to manage. Foster Mother was able to engage with Child during the assessment: when Child became aggressive, Foster Mother remained calm and kept a soft voice. Foster Father was also able to appropriately console Child during his assessment. On the other hand, Child was tense, dissociative, and "disorganized" during Mother's assessment—indicating Child saw Mother as "scary or neglectful." Child was also unable to share her distress and

emotional struggles with Mother, at one point crouching in the corner and hitting herself in the face when Mother reentered the room.

**{10}** While Vendrely did not directly observe most visits, she believed it was in Child's best interest to have Mother's parental rights terminated. Vendrely came to this conclusion because she believed it would be traumatic for Child to return to Mother in light of Mother's inability to reflect, which Vendrely explained "was the number one criteria that shows whether a child will be successful in a relationship with a parent."

**{11}** Halley Shelton testified about her work with Child. Shelton provided occupational therapy for Child on and off since July 2016. When Shelton first began working with Child, there were concerns that Child had suffered a traumatic brain injury as a result of Father's physical abuse. Child suffered from a "global delay" in her development and struggled with gross and fine motor skills, as well as regulating her eating. Child reached many of her developmental goals through occupational therapy but struggled in her social and emotional development. Child needed predictability and a routine to regulate her emotions and eating. Child would probably require continued occupational therapy.

**{12}** Grace Payan, a senior permanency planning worker with CYFD assigned to Mother's case, testified about Mother's compliance with her treatment plan. While Mother stayed in regular contact with CYFD and managed to maintain appropriate housing since April 2018, Mother struggled in other areas of her treatment plan. For example, Mother was inconsistent with taking required UA drug tests. Although Mother took a hair follicle test in November 2018 that came back negative, there have been periods of overlap between clean hair follicle tests and dirty UAs. Mother was also unsuccessfully discharged from her drug treatment program in November 2018 for inconsistent attendance.

**{13}** Mother took her required psychological evaluation and continued to meet with her individual therapist. However, Mother did not follow the psychological evaluation's recommendation to start medication management for the medication she was taking. Instead, Mother stopped taking her medication. Payan believed Mother still needed the medication. In terms of Mother's relationship with Father—who was largely non-compliant with his treatment plan—Mother told Payan they were no longer in a relationship. However, Payan noted that Mother and Father continued to have ongoing verbal altercations. Additionally, Mother reported to Payan that she called the police to escort Father from her home after he verbally threatened her in September 2018.

**{14}** Mother also struggled with her treatment plan items relating to Child. Mother failed to participate in Child's medical and educational appointments: missing at least three appointments Child had at urgent care, as well as Child's final individual family educational plan meeting, despite having prior notice of the appointments and being given a bus pass. Mother had yet to meet Child's psychological needs and had not made progress with her treatment plan item to participate with the Infant Mental Health Program at Amistad, given her refusal to resume collateral sessions with Patch.

Additionally, Payan noted that CYFD conducted a trial home visit for Mother in May 2017, which ended after Mother got evicted and both her and Child tested positive for cocaine. When CYFD attempted to meet with Mother following the failed trial home visit, Mother stormed out of the meeting.

{15}    Payan recommended terminating Mother's parental rights because Mother was unable to put Child's needs above her own, and she failed to complete her drug treatment program. Payan found Mother's inconsistency with her treatment plan particularly concerning given Child's need for consistency. Payan did not believe Child could be safely reunified with Mother at the time of the TPR hearing. Nor could she say whether Mother could make progress if she were allowed more time to work on her treatment plan in light of her inconsistent efforts up to that point.

{16}    Rebecca Majors testified about her work with Mother as her individual therapist. Majors is a licensed clinical counselor and worked with Mother as her therapist since mid-2016. Mother consistently attended therapy sessions. Majors worked with Mother on her parenting skills, trauma, domestic violence, and substance abuse. Mother made some progress in dealing with her past trauma. However, she only made "limited progress" in dealing with her issues with domestic violence. Majors believed Mother learned alternative coping skills to avoid using substances as a means of coping with her past trauma; however, she did not have any licensure or certification in substance abuse counseling, nor was she aware that Mother was unsuccessfully discharged from her substance abuse program.

{17}    Angelina Toyota-Sharpe, an expert in infant mental health and early child childhood development, testified about her independent review of Mother's case at the end of October 2018. As part of her review, Toyota-Sharpe reviewed the infant mental health team's records, notes, and videos. She also met with Mother, the infant mental health team, Majors, and Payan. After conducting her review, Toyota-Sharpe recommended against reunification because Mother had a strong denial of her issues with domestic violence and what brought Child into CYFD custody, nor could Mother accept personal responsibility for her issues. Toyota-Sharpe found this significant because Mother would see herself as powerless to make any changes to protect Child if she could not take responsibility. Given CYFD's "intense efforts" to work with Mother over the life of the case, Toyota-Sharpe did not foresee that Mother would be able to change the causes and conditions of her abuse of Child.

{18}    Several other witnesses testified, including Mother and Foster Parents. At the conclusion of the second day of the hearing, the district court orally granted CYFD's motion to terminate Mother's parental rights, concluding that Mother was unlikely to change the conditions and causes of her abuse of Child within the foreseeable future despite CYFD's reasonable efforts to assist her. The court subsequently entered extensive findings of fact and conclusions of law supporting its ruling to terminate Mother's parental rights. This appeal followed.

**DISCUSSION**

**{19}** Mother makes two arguments on appeal. First, Mother contends there was insufficient evidence that CYFD made reasonable efforts to assist her. Second, Mother contends there was insufficient evidence that she was unlikely to change the conditions and causes of her abuse of Child in the foreseeable future. We address each argument in turn.

## Standard of Review

**{20}** NMSA 1978, Section 32A-4-28(B)(2) (2005) of the Abuse and Neglect Act (ANA) provides that the district court shall terminate parental rights if

> the child has been neglected or abused as defined in the [ANA] and the court finds that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by [CYFD] to assist the parent in adjusting the conditions that render the parent unable to properly care for the child.

CYFD must demonstrate these elements by clear and convincing evidence. *State ex rel. Children, Youth & Families Dep't v. Vanessa C.*, 2000-NMCA-025, ¶ 24, 128 N.M. 701, 997 P.2d 833. "Clear and convincing evidence is . . . evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact[-]finder's mind is left with an abiding conviction that the evidence is true." *State ex rel. Children, Youth & Families Dep't v. Lance K.*, 2009-NMCA-054, ¶ 16, 146 N.M. 286, 209 P.3d 778 (alteration, internal quotation marks, and citation omitted).

**{21}** In reviewing a claim challenging the sufficiency of the evidence, we must determine whether the district court's decision is supported by substantial evidence of a clear and convincing nature. *See State ex rel. Children, Youth & Families Dep't v. Alfonso M.-E.*, 2016-NMCA-021, ¶ 26, 366 P.3d 282. "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted). "We will uphold the district court's judgment if, viewing the evidence in the light most favorable to the judgment, a fact[-]finder could properly determine that the clear and convincing standard was met." *State ex rel. Children, Youth & Families Dep't v. Hector C.*, 2008-NMCA-079, ¶ 11, 144 N.M. 222, 185 P.3d 1072 (internal quotation marks and citation omitted). Hence, we ask "whether the [district] court's conclusion, when viewed in the light most favorable to the decision below, was supported by substantial evidence, not whether the [district] court could have reached a different conclusion." *State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 31, 132 N.M. 299, 47 P.3d 859.

## Reasonable Efforts

**{22}** We consider the totality of the circumstances when reviewing the district court's determination that CYFD made reasonable efforts to assist the parent. *State ex rel. Children, Youth & Families Dep't v. Keon H.*, 2018-NMSC-033, ¶ 41, 421 P.3d 814. "Efforts to assist a parent may include individual, group, and family counseling,

substance abuse treatment, mental health services, transportation, child care, and other therapeutic services." *Id.* (internal quotation marks and citation omitted). "[W]hat constitutes reasonable efforts may vary with a number of factors, such as the level of cooperation demonstrated by the parent and the recalcitrance of the problems that render the parent unable to provide adequate parenting." *Id.* (internal quotation marks and citation omitted). "[W]e also consider the duration of reunification services provided to a parent by CYFD prior to resorting to termination[,]" *Alfonso M.-E.*, 2016-NMCA-021, ¶ 54, and use the fifteen-month "time-limited reunification services" period set forth under the Adoption and Safe Families Act of 1997 (ASFA), Pub. L. No. 105-89, 111 Stat. 2115, as a touchstone in our reasonable efforts analysis. *Patricia H.*, 2002-NMCA-061, ¶ 26. In the end, "our job is not to determine whether CYFD did everything possible; our task is limited by our statutory scope of review to whether CYFD complied with the minimum required under law." *Patricia H.*, 2002-NMCA-061, ¶ 28.

**{23}** Viewing the evidence in the light most favorable to the judgment, we conclude there was substantial evidence of a clear and convincing nature that CYFD made reasonable efforts to assist Mother. CYFD worked with Mother for at least two years before the TPR hearing. During that time, CYFD referred Mother to an individual counselor to work on issues with parenting, trauma, domestic violence, and substance abuse. CYFD referred Mother to a drug treatment program. CYFD gave Mother a bus pass to assist her in attending services and visitations. CYFD arranged visitations with Child. CYFD set up a psychological evaluation for Mother and referred her to a physician for medication management. CYFD also referred Mother to Amistad to work on her parenting skills with Child.

**{24}** Mother challenges the reasonableness of the services CYFD offered through Amistad, which Mother claims was biased against reunification. In support of this argument, Mother relies on Amistad's decision not to arrange for a new therapist to assist Mother with parenting after her relationship with Patch deteriorated. Mother also claims that Patch failed to provide her with any parenting instruction during the dual sessions with Child that continued after Mother's collateral sessions with Patch ended. Given this, Mother argues CYFD failed to make reasonable efforts to assist her in developing the skills necessary to properly care for Child. We disagree.

**{25}** Amistad decided to stop Mother's collateral sessions with Patch in April or May 2018—nineteen to twenty months after Patch first began working with Mother and Child. Importantly, Amistad only stopped the sessions because of Mother's hostility, which included yelling, using profanity, and leaving sessions early. Amistad offered to resume the collateral sessions when Mother was ready; however, Mother refused. Even after Amistad stopped Mother's collateral sessions, Patch continued to work with Mother and Child in the dual sessions. Patch continued to attempt to work around Mother's concerns, giving Mother more opportunities to work with Child without intervention and going over videotaped sessions with Mother on separate days.

**{26}** As our Supreme Court has declared, "[W]hat constitutes reasonable efforts may vary with a number of factors, *such as the level of cooperation demonstrated by the*

*parent*[.]" *Keon H.*, 2018-NMSC-033, ¶ 41 (emphasis added) (internal quotation marks and citation omitted). Mother's hostility and refusal to resume collateral sessions with Patch does not render CYFD's efforts unreasonable. Nor does it appear any of Amistad's decisions were motivated out of a bias against reunification. To the contrary, Patch testified that she worked toward the goal of reunification and supporting the relationship between the child and parent. In regard to Amistad's decision not to switch therapists, the infant mental health team members explained that they made this decision because changing therapists would disrupt Child's progress in therapy because Child felt safe with Patch. This comports with CYFD's mandate that it make "[r]easonable efforts . . . to preserve and reunify the family, *with the paramount concern being the child's health and safety*." NMSA 1978, § 32A-4-22(C) (2009, amended 2016) (emphasis added). Patch also explained that Amistad was unable to offer a separate therapist to conduct Mother's collateral sessions because the sessions were dependent on analyzing the dual sessions.

**{27}** In terms of Patch's purported failure to provide Mother with any parenting instruction during the dual sessions with Child, Patch testified that she believed she offered the services necessary for Mother to reach the goal of being able to safely care for Child throughout the life of the case. To the extent Mother relies on other witnesses' testimony, including her own, to contradict Patch's testimony about the parenting instructions she provided Mother, "[w]e will not reweigh the evidence, but will view it in a light most favorable to affirmance." *State ex rel. Children, Youth & Families Dep't v. Anne McD.*, 2000-NMCA-020, ¶ 13, 128 N.M. 618, 995 P.2d 1060; *State ex rel. Children, Youth & Families Dep't v. Vanessa C.*, 2000-NMCA-025, ¶ 24, 128 N.M. 701, 997 P.2d 833 (stating that this Court defers to the conclusions of the trier of fact and does not assess the credibility of the witnesses). Moreover, notwithstanding the fact that the collateral sessions involved more processing and reflection, we again emphasize that it was Mother's behavior that led to the collateral sessions' cessation.

**{28}** Finally, to the extent Mother claims Amistad could have done more to assist her, such as scheduling sessions outside of the Amistad offices and providing Mother with copies of her videotaped sessions, we note that CYFD—including the providers to which it refers parents—is not required to do "everything possible" but only "compl[y] with the minimum required under law." *Patricia H.*, 2002-NMCA-061, ¶ 28. For the forgoing reasons, we conclude that it did.

**Likelihood of Change in the Foreseeable Future**

**{29}** We now turn to Mother's argument that there was insufficient evidence that she was unable to change the conditions and causes of her abuse of Child in the foreseeable future. "We have interpreted the term 'foreseeable future' to refer to corrective change within a reasonably definite time or within the near future." *Patricia H.*, 2002-NMCA-061, ¶ 34 (internal quotation marks and citation omitted). In reviewing the district court's determination that a parent was unlikely to change the conditions and causes of abuse in the foreseeable future, we keep in mind that the district court must "give primary consideration to the physical, mental and emotional welfare and needs of

the child." Section 32A-4-28(A). Accordingly, "in balancing the interests of the parents and children, the [district] court is not required to place the children indefinitely in a legal holding pattern." *Patricia H.*, 2002-NMCA-061, ¶ 34 (internal quotation marks and citation omitted).

**{30}** Viewing the evidence in the light most favorable to the judgment, we conclude there was substantial evidence of a clear and convincing nature that the conditions and causes of Mother's abuse were unlikely to change in the foreseeable future. Mother missed several of Child's medical and educational appointments, despite having prior notice and a means of transportation. Mother was inconsistent with taking UA drug tests and was unsuccessfully discharged from her drug treatment program. Mother never began medication management, instead deciding to stop taking her medication altogether.

**{31}** While Mother made some progress in dealing with her past trauma in individual therapy, she only made "limited progress" in dealing with her issues with domestic violence. After conducting an independent review of Mother's case, Toyota-Sharpe noted that Mother continued to have a strong denial of her issues with domestic violence and what brought Child into CYFD custody, nor could Mother accept personal responsibility for her issues. As Toyota-Sharpe explained, this was significant because Mother would see herself as powerless to make any changes necessary to protect Child in the future if Mother could not take responsibility.

**{32}** Patch testified that Mother was not able to make "nearly enough" progress to safely care for Child—who had greater needs than other children her age. Vendrely recommended terminating Mother's parental rights because she believed it would be traumatic for Child to return to Mother in light of Mother's inability to reflect, which Vendrely believed was an important indicator of "whether a child will be successful in a relationship with a parent." Payan similarly recommended terminating Mother's parental rights because Mother was unable to put Child's needs above her own and made inconsistent efforts to comply with her treatment plan. Toyota-Sharpe agreed with this conclusion after conducting her independent review.

**{33}** Mother argues that this evidence was insufficient because CYFD failed to present current evidence of Mother's inability to properly care for Child, instead relying on past problems to "bootstrap" the conclusion that Mother could not change. In particular, Mother takes issue with CYFD's reliance on Vendrely's evaluation, which was performed one year before the TPR hearing. However, Mother ignores the substantial testimony outlined above that was based on recent observations of Mother. For instance, Toyota-Sharpe performed her independent review—which included reviewing the infant mental health team's records, notes, and videos, as well as meeting with Mother, the infant mental health team, Majors, and Payan—at the end of October 2018. Additionally, Payan testified that she based her recommendation to terminate Mother's parental rights, in part, on Mother's unsuccessful discharge from her drug treatment program in November 2018. Given this evidence of Mother's lack of compliance with her treatment plan up until the TPR hearing, Mother's argument is unpersuasive. *Cf. Hector*

*C.*, 2008-NMCA-079, ¶¶ 16-17 (holding that evidence from two years prior to TPR hearing was stale in light of the father's "substantial changes" he made after being released from prison and evidence that he "participated willingly, voluntarily, and enthusiastically in all the programs that CYFD recommended").

**{34}** Mother also argues that CYFD failed to affirmatively prove that Mother could not change the conditions and causes of the abuse in the foreseeable future, instead transferring the burden to Mother to prove the converse. In support of this argument, Mother cites *Alfonso M.-E.*, in which we held that the district court erroneously shifted the burden of proof to the father by holding an "informational deficit regarding [his] alcohol and substance use against him." 2016-NMCA-021, ¶ 37. Mother's reliance on *Alfonso M.-E.* is misplaced. Unlike *Alfonso M.-E.*, we fail to perceive any "informational deficit" regarding Mother's inconsistent efforts to comply with her treatment plan, nor is there any indication in the record that the district court improperly shifted the burden to Mother in this case. *Id.*

**{35}** Mother also appears to argue that the district court based its decision to terminate her parental rights on an improper comparison of the home environment Foster Parents were able to provide Child. *See Patricia H.*, 2002-NMCA-061, ¶ 21 ("The fact that a child might be better off in a different environment is not a basis for termination of parental rights in this state." (internal quotation marks and citation omitted)). However, Mother fails to support this argument with any citation to the record indicating the district court based its decision to terminate her parental rights on such an improper comparison (as opposed to evidence of Mother's inability to properly care for Child). *See* Rule 12-318(A)(4) NMRA (stating that an appellant shall support her argument "with citations to authorities, record proper, transcript of proceedings, or exhibits relied on"). Accordingly, we decline to address this argument. *See State ex rel. Children, Youth & Families Dep't v. Senaida C.*, 2008-NMCA-007, ¶ 27, 143 N.M. 335, 176 P.3d 324 (declining to address arguments unsupported by citations to the record or relevant authority); *see also Farmers, Inc. v. Dal Mach. & Fabricating, Inc.*, 1990-NMSC-100, ¶ 8, 111 N.M. 6, 800 P.2d 1063 (stating that the appellate courts presume that the district court is correct, and the burden is on the appellant to clearly demonstrate error).

**{36}** Finally, Mother argues that the district court should have credited the testimony of "objective observers . . . that Mother was able to provide emotional safety for Child" rather than the "[n]egative testimony" of Patch, "who clearly did not like Mother," and Vendrely, who only observed Mother "in passing" in an "uncomfortable" environment for Mother and Child. Again, our job is not to reweigh the testimony but rather to look at the evidence in the light most favorable to the district court's conclusion. *See Anne McD.*, 2000-NMCA-020, ¶ 13; *Vanessa C.*, 2000-NMCA-025, ¶ 24. In light of the testimony outlined above, we conclude substantial evidence of a clear and convincing nature supported the district court's determination that Mother was unlikely to change the conditions and causes of her neglect in the foreseeable future.

**CONCLUSION**

**{37}** For the foregoing reasons, we affirm the district court's termination of Mother's parental rights to Child.

**{38}  IT IS SO ORDERED.**

**JACQUELINE R. MEDINA, Judge**

**WE CONCUR:**

**LINDA M. VANZI, Judge**

**BRIANA H. ZAMORA, Judge**