2004-NMCA-083

94 P.3d 796

**STATE of New Mexico, ex rel., CHILDREN, YOUTH & FAMILIES DEPARTMENT, Petitioner–Appellee,**

v.

**MARIA C., Respondent–Appellant,**

and

**In the Matter of Rudolfo L., Roberto C., Alvaro C., Cassandra L., and Anthony M., Children.**

No. 23,789.

Court of Appeals of New Mexico.

April 30, 2004.

Ernest O. Pacheco, Santa Fe, for Petitioner.

Jane Bloom Yohalem, Santa Fe, for Respondent.

Caroline Bass, Santa Fe, Guardian ad Litem.

*OPINION*

BUSTAMANTE, J.

{1}  This is an appeal from a decision by the district court to terminate the parental rights of Maria C. (Mother), pursuant to NMSA 1978, § 32A-4-28(B)(2) (2001). Mother argues that the order should be set aside as a matter of due process because she was denied any opportunity to be present at the two permanency hearings that preceded the final termination hearing (TPR hearing). We address two issues: (1) whether the initial and subsequent permanency hearings merit due process protection; and (2) if so, whether the procedures afforded Mother in the neglect and abuse proceedings denied her due process.

## FACTS AND PROCEDURES

{2}  Maria C. is the natural mother of Roberto C., Alvaro C., Cassandra L., and Anthony M. On August 25, 2000, Mother and the biological father (Father) of Anthony M. were arrested at their home by federal authorities on charges of drug possession and drug trafficking.  The children, who ranged in age from nine months to eleven years, were taken into the custody of the Children, Youth and Families Department (CYFD). During the entire abuse and neglect proceedings, Mother and Father were incarcerated as federal prisoners.  Although the children are United States citizens, both parents are Mexican Nationals.

{3}  Following the arrest, CYFD filed petitions against Mother and Father alleging they had abused and neglected their children.  At the custody hearing, the district court found both parents were unable to care for the children due to their incarceration. The district court ordered CYFD to retain legal custody, arrange for regular visitation, explore relative placement, and conduct a psychosocial evaluation of Mother and a paternity test on Father who denied being the natural father of Anthony M.

{4}  At the adjudicatory hearing on October 16, 2000, Mother was represented by counsel and appeared by telephone, with the assistance of an interpreter.  Mother pleaded no contest to the allegation of neglect based on Mother's incarceration, under NMSA 1978, Section 32A-4-2(E)(4) (1999), and on concerns about substance abuse.  The district court subsequently entered a judgment, finding that the children were neglected and ordering that legal custody remain with CYFD. A disposition order was entered on December 7, 2000; the district court adopted the findings of the predisposition study and treatment plan, but withdrew its previous order allowing Mother to have contact with the children, apparently in response to their wishes.

{5}  On February 27, 2001, after the children were placed in relative foster care in Santa Fe, venue was transferred to the First Judicial District Court, and Mother was transferred from the Sandoval County Detention Center to the Santa Fe County De-

tention Center. Dennis Quintana was appointed as Mother's new counsel on April 30. The first judicial review hearing was held on July 24, 2001. Although Quintana filed an order to transport Mother and appeared on her behalf, Mother was not present at the hearing. The permanency plan for the children through this time was reunification.

{6} The first permanency hearing was held on August 21, 2001. Once again, Mother was not present, and although Quintana was present, he never spoke on her behalf. Instead, Father's counsel, Art Michael, represented that he was speaking on behalf of both parents. Michael explained that Quintana had filed a transport order, but because both parents were in federal prison, they needed a writ of habeas corpus for their release to the hearing. He also stated that the social worker had provided him information to contact the federal marshal, and indicated that he would prepare the necessary paperwork so they could attend the next hearing. CYFD informed the court that it intended to change the permanency plan to adoption, since both parents were expected to serve long sentences in federal prison, and CYFD wanted them present for relinquishment counseling. CYFD also alerted the court that telephonic appearances might be necessary if the parents were moved to federal prison. A continuance was granted and the hearing was reset for September 18, 2001, to afford counsel more time to arrange for transporting the parents.

{7} Despite this accommodation, counsel failed to obtain a writ, and as a result, neither parent appeared at the September permanency hearing either. Speaking on behalf of both parents, Michael stated that he talked to the marshal, obtained the writs and instructions on how to prepare them, and that he understood the steps he needed to take to accomplish the task, but he did not do it. The court suggested that the parents could appear by telephone, but Michael rejected this alternative because "they want to be here," and he assured the court that he would get them transported; "I've... just got to get the stuff done .... So there is no excuse not to bring him here." Without admonishing counsel or addressing the issue,

the court reset the hearing for November 18, 2001. Although this Court was not provided a transcript of the November hearing, there is no indication that the situation improved: no writ was filed, counsel were not admonished, and the hearing was continued.

{8} Even by the fourth setting on January 8, 2002, nearly nine months after Quintana was appointed, Mother was still not present. In fact, counsel admitted he had never spoken to her and did not even know where she was incarcerated. Nor was Father present. Michael advised the court that Father had recently been sentenced to thirty-two months, had served roughly sixteen months of that sentence, and was incarcerated at La Tuna federal prison in Anthony, New Mexico–Texas. Astoundingly, even though he admitted that he had never talked to her federal defense attorney, Michael also represented that Mother pleaded to the same charges, and, while she was not yet sentenced, it was her second conviction, so she would be serving "a pretty good sentence." The record indicates that Mother actually pleaded guilty on June 22, 2002, and was later sentenced to five years in federal prison, followed by four years probation, with credit for time served. Father was actually sentenced to thirty-seven months in federal prison.

{9} CYFD moved the district court to find that the presumption for return was rebutted due to incarceration and requested the court to change the plan to adoption, because Father had at least sixteen months to serve and Mother could get more time because she was facing a second conviction. Michael stipulated that the presumption was sufficiently rebutted, but asked that the reunification plan be continued because Father would be out in sixteen months. Quintana, who remained silent during most of the hearing, agreed with Michael's representations and made no attempt to argue on behalf of his client. Based on counsels' stipulation, the court found that the presumption was rebutted because both parents were incarcerated and changed the permanency plan to adoption; "[a]lthough 16 months is not very long in adult life, it is very long in a child's life."

{10} On March 7, 2002, CYFD filed a Motion for TPR. In the interim, a second

permanency hearing was held on April 2, 2002, addressing the futility issue. Once again, counsel filed a transport order but neglected to file a writ of habeas corpus. Not surprisingly, neither parent was present. Quintana attempted to get Mother on the telephone at the hearing, but to no avail. Quintana then requested a continuance; his reason, self-evident, was that "the transport order is not adequate," and "evidently what's needed is a writ." The district court denied the continuance, and for the first time, admonished counsel for their inability to secure their clients' presence at the hearings, despite knowing for months that a writ was necessary. The district court found that Mother was unable to rebut the presumption for adoption because she was absent and that CYFD was not required to make further efforts to reunite the family. After the ruling, Quintana, who met with Mother for the first time on March 25, made an offer of evidence: Mother and the older children had exchanged letters; she had participated in several jail programs to improve her parenting skills; and she was trying to get into an early release program.

{11} A pretrial hearing was held on May 7, 2002. Quintana finally successfully obtained a writ of habeas corpus and Mother appeared at the hearing. Father appeared by telephone. The district court advised the parties of its primary concern that the children have permanency and stability in their lives. Mother informed the district court that she was not yet sentenced; she also requested visitation, submitted documentation of the several programs she had completed in jail, related that she and the children had exchanged cards and letters, and requested the district court to consider placing the baby with Father's brother. As a result, the district court reinstated written contact between Mother and the children and ordered CYFD to make an individual assessment of whether visitation was appropriate for each child and to determine whether relative placement of the baby was viable.

{12} The TPR hearing for Mother was held on July 22, 24, and August 20, 2002. Mother was present and testified extensively over a three day period. CYFD called two witnesses, both social workers who were assigned to the case. The district court issued its decision, along with findings of fact and conclusions of law on September 13, 2002, finding that the children were abused and neglected as defined in the Children's Code. The district court further found that efforts to reunite the family were impossible because of Mother's incarceration as a federal prisoner since August 2000, and that visits were not recommended because of the disruptive effect on the children, as well as their placement.

> Considering [Mother's] history related to drug trafficking, considering the detriment to the relationship between [Mother] and the children resulting from her two incarcerations, considering the circumstances involving deportation which will exist once [Mother] is released from federal prison, considering the exposure to drug culture the children have experienced while in the care of [Mother], and considering the privation demonstrated by the children when they were first placed in petitioner's legal custody, there is no reason to believe that [Mother] will overcome the causes and conditions of abuse and neglect of the children at any time in the foreseeable future[,] ... [and, under] [t]he circumstances in this case ... any efforts to reunite the children with [Mother] would be futile.

{13} The district court found adoption was in the childrens' best interest: "[t]he children are currently placed in homes where they are well adjusted, where their needs are being met, and where they are likely to be adopted." Further, the children "do not wish to return to Mexico," and the older boys "wish to continue to live with their current foster parents." Although the girl "desires to live with her siblings, ... she does not believe her mother should have a second chance to have the children placed with her." The baby, who "has been placed in his current foster home for most of his life, has bonded to his foster mother, [and] does not remember his [Mother]." The district court concluded that termination was in their best interest and terminated Mother's parental rights to all four children. Mother timely filed a notice of appeal from the final order

terminating her parental rights, which was entered on December 9, 2002.

**PRESERVATION**

{14}   CYFD urges this Court not to consider Mother's due process claim because it was not preserved below. Although the argument made by counsel for Mother at the initial permanency hearing was not well articulated, we find the discussion regarding due process was sufficient to alert the district court to a due process claim. At the permanency hearing on January 8, 2001, CYFD requested the district court to find that the presumption of return was rebutted and to change the permanency plan to adoption because Mother and Father were incapable of caring for their children in the foreseeable future due to their incarceration and the expectation that they would serve lengthy sentences of sixteen months or more. CYFD argued that, under New Mexico case law, Mother's absence from the permanency hearing did not raise any due process concerns, so long as she received due process at the TPR hearing. Michael, who was speaking on behalf of both parents, stipulated that they were in jail but objected to a change in the permanency plan. Michael stated that he did not know about the cases which CYFD referred to regarding due process but he argued that it was "ridiculous" to change the plan because "this guy has had nothing from his lawyer, from the courts, from anything." Quintana agreed, but chose not to argue the point any further. The district court did not respond to the arguments on the record. While it was advisable for counsel to request a ruling on the issue, their failure to do so is not fatal to Mother's claim.

{15}   Quintana raised the due process claim again at the TPR hearing. At closing, he argued that termination was improper because Mother was denied her due process right to participate in the earlier hearings. The court ruled that the claim was precluded by the fact that Mother was present at the TPR hearing to defend against the charges, and because Mother's absence was based on ineffective assistance of counsel, not due process. Under these facts, we find that the court was sufficiently alerted to the claimed error and that Mother preserved her claim.

*See* Rule 12–216(A) NMRA 2004; *Madrid v. Roybal,* 112 N.M. 354, 356, 815 P.2d 650, 652 (Ct.App.1991).

**DUE PROCESS**

{16}   As a starting point, we note that Mother does not challenge the sufficiency of the evidence in support of the termination of her parental rights. Mother's claim is that due process rights attach at the permanency hearing and that proceeding with these hearings in her absence, especially in the face of counsel's gross incompetence and acknowledged inability to defend her at the permanency hearing, violated her due process right to be heard at a meaningful time and in a meaningful manner, increasing the risk of an erroneous decision at the permanency hearings and the TPR hearing.

**STANDARD OF REVIEW**

{17}   New Mexico parents have a due process right to participate meaningfully in TPR hearings, including the right to present evidence on their behalf and the right to review and challenge the evidence presented against them. *State ex rel. Children, Youth & Families Dep't v. Lorena R.,* 1999–NMCA–035, ¶ 25, 126 N.M. 670, 974 P.2d 164. The legal question whether due process attaches earlier in the proceedings, however, is an issue of first impression. We review issues of law de novo. *Williams v. Williams,* 2002–NMCA–074, ¶ 8, 132 N.M. 445, 50 P.3d 194.

**STATUTORY RIGHTS IN NEGLECT AND ABUSE PROCEEDINGS**

{18}   The Abuse and Neglect Act details the procedures and timelines the State must follow when it invokes the jurisdiction of the district court to take physical and/or legal custody of a child whom it alleges to be abandoned, neglected, or abused. NMSA 1978, §§ 32A–4–1 to –33 (1978, as amended through 2003) (Abuse and Neglect Act). To place the permanency hearings in context, we briefly describe the general course of these proceedings. CYFD must file a petition within two days after it takes custody of a child for neglect or abuse by a parent. § 32A–4–7(D). A custody hearing is held within ten days of filing to determine whether CYFD should retain legal custody pending

adjudication of the petition. § 32A–4–18(A). The district court has sixty days from service to hold an adjudicatory hearing, after which, it must enter a disposition on the allegations, along with specific findings and approval of a treatment plan. §§ 32A–4–19 to –22. A judicial review hearing is held within sixty days of the disposition to assess the progress with the treatment plan, as well as the child's safety. § 32A–4–25(A).

{19} Within six months of the judicial review, an initial permanency hearing is held to determine permanent placement of the child. § 32A–4–25.1(A). The district court considers whether the best interest of the child is served to return home, adoption, or other permanent placement. § 32A–4–25.1(D). There is a rebuttable presumption that the child's interest will be best served by returning the child to the natural home. § 32A–4–25.1(B) (parental presumption). If CYFD fails to rebut the presumption by a preponderance of the evidence, the court may either dismiss the case and return the child home or maintain legal custody of the child with CYFD and continue the reunification plan for up to six months. § 32A–4–25.1(C). If CYFD rebuts the presumption, however, the court must change the permanency plan to adoption or other permanent placement. § 32A–4–25.1(D).

{20} If the plan is not changed or a TPR motion is not filed, a second permanency hearing must be held within three months. § 32A–4–25.1(D), (E). At this stage, the presumption is that adoption or other permanent placement is in the child's best interest. § 32A–4–25.1(E). If the parents fail to rebut this presumption by a preponderance of the evidence, the district court must enter an order changing the plan to adoption and relieving CYFD of any further efforts to reunite the child and parent. § 32A–4–25.1(F). If the presumption is rebutted, the child can be returned and the case dismissed or the child can remain in CYFD's custody and the plan for reunification continued for not more than six months. § 32A–4–25.1(G)

{21} Parents do not have an unlimited time to rehabilitate and reunite with their children. Under the federal Adoption and Safe Families Act (ASFA), states receive fifteen months of "time-limited reunification services" and must move quickly to find permanent placement for children. *See* 42 U.S.C. § 629a(a)(7)(A) (2000); *see also State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002–NMCA–061, ¶ 26, 132 N.M. 299, 47 P.3d 859. Under the ASFA time table, disposition must occur one month after adjudication; the initial judicial review must be held two months after disposition; the initial permanency hearing within six months of the initial judicial review; and the second permanency hearing must convene three months after the initial hearing. *New Mexico Child Welfare Handbook, A Legal Manual on Child Abuse and Neglect* § 20.2 (N.M. Judicial Educ. Ctr., Inst. Pub. Law 2003). Although these guidelines are flexible, they must be harmonized with the requirements of state law. *Patricia H.*, 2002–NMCA–061, ¶ 26, 132 N.M. 299, 47 P.3d 859. State law allows a reunification plan to be maintained for a maximum of fifteen months as well. *See* §§ 32A–4–25.1(C), (G), –29(K).

{22} Barring exceptional circumstances, the Abuse and Neglect Act requires a termination motion to be filed when the child has been in foster care for fifteen out of twenty-two months. § 32A–4–29(A), (K). Parental rights may be terminated when the court finds that (1) the child has been abandoned, neglected, or abused by his or her parents; (2) those circumstances are unlikely to change in the foreseeable future, despite reasonable efforts by CYFD to assist the family; and (3) further efforts would be futile. § 32A–4–28(B). Because a TPR hearing irrevocably divests parents of all legal rights in their children, we require a more formal hearing, and CYFD carries the burden of proof by clear and convincing evidence. § 32A–4–29(M); *see State ex rel. Children, Youth & Families Dep't v. Vanessa C.*, 2000–NMCA–025, ¶ 13, 128 N.M. 701, 997 P.2d 833.

{23} The express purpose of the Abuse and Neglect Act is to: (1) make the best interest of the child paramount; (2) preserve the unity of family, to the maximum extent possible; and (3) to assure that "the parties [receive] a fair hearing and their constitutional and other legal rights are recognized

and enforced." NMSA 1978, § 32A–1–3(B) (1999). To facilitate these goals, the Act accords parents a right to counsel from the inception of the proceedings. § 32A–4–10. CYFD must give parents notice if it files a petition, as well as notice of any hearing, up to and including the TPR hearing. §§ 32A–4–7(C), –18(B), –25(C), –25.1(H), –29(D). Parents also have a statutory right to present evidence and cross-examine witnesses during the judicial review and permanency hearings, although the rules of evidence are not applicable. §§ 32A–4–25(D), (E); 32A–4–25.1(B), (E), and (I). Finally, CYFD has a continuing duty to make reasonable efforts to preserve and reunify the family, until the district court finds that its efforts would be futile. §§ 32A–4–25(D), (H)(5), –25.1(F)(2).

**PARENTS ARE ENTITLED TO DUE PROCESS AT THE PERMANENCY HEARINGS**

{24} Although we give substantial weight to the judgment of our legislators that the procedures they have provided assure fundamental fairness, *see Mathews v. Eldridge*, 424 U.S. 319, 349, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the procedures which they have deemed necessary do not define minimum due process requirements. *See Santosky v. Kramer*, 455 U.S. 745, 755, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Root principles of fairness dictate that procedural due process be afforded whenever a government decision threatens to deprive an individual of a fundamental liberty or property interest. *Mathews*, 424 U.S. at 332–33, 96 S.Ct. 893. A parent's fundamental liberty interest in the care, custody, and management of their children is well established. *Santosky*, 455 U.S. at 753, 102 S.Ct. 1388; *accord Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); *see State ex rel. Children, Youth & Families Dep't v. Mafin M.*, 2003–NMSC–015, ¶ 18, 133 N.M. 827, 70 P.3d 1266; *State ex rel. Children, Youth & Families Dep't v. Joe R.*, 1997–NMSC–038, ¶ 29, 123 N.M. 711, 945 P.2d 76. "[T]he parent-child relationship is one of basic importance in our society ... sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *State ex rel. Children, Youth & Families Dep't v. Anne McD.*, 2000–NMCA–020, ¶ 22, 128 N.M. 618, 995 P.2d 1060 (alteration in original) (internal quotation marks and citation omitted). "Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." *Santosky*, 455 U.S. at 753, 102 S.Ct. 1388. Thus, we have recognized that process is due when a proceeding affects or interferes with the parent-child relationship. *State ex rel. Children, Youth & Families Dep't v. Stella P.*, 1999–NMCA–100, ¶ 14, 127 N.M. 699, 986 P.2d 495; *see State ex rel. Children, Youth & Families Dep't v. Rosa R.*, 1999–NMCA–141, ¶ 13, 128 N.M. 304, 992 P.2d 317 (recognizing that constitutionally adequate procedures must be in place before the State can investigate or terminate the parent-child relationship).

{25} The statutory scheme which our legislature enacted to protect children and adjudicate parental rights represents a continuum of proceedings which begins with the filing of a petition for neglect or abuse and culminates in the termination of parental rights. *Watson v. Div. of Family Servs.*, 813 A.2d 1101, 1106 (Del.2002). Because due process is a flexible right, the amount of process due at each stage of the proceedings is reflective of the nature of the proceeding and the interests involved, as well as the nature of the subsequent proceedings. *See Santosky*, 455 U.S. at 758, 102 S.Ct. 1388 (extent of due process afforded to the individual is "influenced by the extent to which he may be 'condemned to suffer [a] grievous loss'") (citation omitted); *see also Vanessa C.*, 2000–NMCA–025, ¶¶ 11–20, 128 N.M. 701, 997 P.2d 833 (observing that the TPR hearing is more formal than other abuse and neglect hearings because of the "weighty issues" involved which was critical to its holding that a formal hearing was not constitutionally required at the judicial review stage in that case where mother had notice and an opportunity to challenge evidence, which was corroborated and clarified at a formal TPR hearing); *Anne McD.*, 2000–NMCA–020, ¶ 19, 128 N.M. 618, 995 P.2d 1060 (recognizing that parents have a "more critical need for procedural protections [at TPR hearings] than do those resisting state intervention into

ongoing family affairs") (internal quotation marks and citation omitted). "What might constitute due process when lesser rights are involved, might not constitute due process when the state seeks to terminate parental rights." *Id.* ¶ 22. Consequently, the more vital the proceeding is to a parent's interest, the more process they are due. *See Santosky,* 455 U.S. at 753, 102 S.Ct. 1388.

{26} The essence of due process is notice and "an opportunity to be heard at a meaningful time and in a meaningful manner." *Mafin M.,* 2003–NMSC–015, ¶ 18, 133 N.M. 827, 70 P.3d 1266 (internal quotation marks and citation omitted); *Lorena R.,* 1999–NMCA–035, ¶ 17, 126 N.M. 670, 974 P.2d 164 (internal quotation marks and citation omitted); *accord Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Mathews,* 424 U.S. at 333, 96 S.Ct. 893. Fair notice is at bottom effective notice, "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *In re Ronald A. v. State ex rel. Human Servs. Dep't,* 110 N.M. 454, 456, 797 P.2d 243, 245 (1990) (internal quotation marks and citation omitted). The opportunity to be heard in a "meaningful manner," generally includes an opportunity to review and present evidence, confront and cross examine witnesses, and consult with counsel, either by way of an informal or formal hearing. *See Lorena R.,* 1999–NMCA–035, ¶ 26, 126 N.M. 670, 974 P.2d 164.

{27} To be heard at a "meaningful time" in the context of a multi-stage criminal proceeding, both the United States Supreme Court and the New Mexico Supreme Court have recognized that due process attaches at critical stages in the proceedings. *See, e.g., Rushen v. Spain,* 464 U.S. 114, 117, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (per curiam) (recognizing that defendants have a right to be present at critical stages when their absence would deny their right to a fair hearing); *Coleman v. Alabama,* 399 U.S. 1, 7–10, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (holding that defendant has a right to counsel at all critical proceedings, including the prelimi-

nary hearing stage); *State v. Padilla,* 2002–NMSC–016, ¶ 11, 132 N.M. 247, 46 P.3d 1247 (acknowledging that defendants have a constitutional right to be present with assistance of counsel at all critical stages of a trial). Both Courts have held that critical stages include: (1) proceedings in which fundamental rights might be lost or adversely affected and where prejudice might be avoided if defendant and counsel are present; *Coleman,* 399 U.S. at 7, 90 S.Ct. 1999; *accord Padilla,* 2002–NMSC–016, ¶ 11, 132 N.M. 247, 46 P.3d 1247; (2) the proceedings which bear a substantial relationship to a defendant's opportunity to better defend at trial and presence at the proceedings would be useful or beneficial to the defense; *Kentucky v. Stincer,* 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987); *see State v. Martinez,* 2002–NMSC–008, ¶ 14, 132 N.M. 32, 43 P.3d 1042 (holding that defendant had a right to be present at a plea reconstruction hearing because he could have provided important information to aid in his defense); or (3) proceedings where vitally important statutory rights are at stake. *Kent v. United States,* 383 U.S. 541, 556–57, 86 S.Ct. 1045, 16 L.Ed.2d 84 (holding that juvenile transfer proceeding protects vitally important statutory rights that entitles defendant to a fair hearing); *accord Christopher P. v. State,* 112 N.M. 416, 418, 816 P.2d 485, 487 (1991) (reasoning that the Fifth Amendment right against self incrimination extends to transfer proceeding because it is a critically important proceeding that exposes a child to adult criminal liability and essential due process is required).

{28} Because the process due reflects the nature of the proceeding and the interests involved, we have no doubt that a parent, like a criminal defendant, has a constitutional right to fair notice and an opportunity to participate in all critical stages of abuse and neglect proceedings. Critical stages in abuse and neglect cases, as in criminal cases, include proceedings that threaten a parent's liberty interest in raising their child or provide an early opportunity to prepare and mount a defense or affect vital statutory rights. *See Santosky,* 455 U.S. at 762, 102 S.Ct. 1388 (noting that a TPR pro-

ceeding "bears many of the indicia of a criminal trial").

{29} Permanency hearings can represent a critical stage in all three regards. The permanency hearings are a crucial juncture in abuse and neglect proceedings that might very well lead to profound consequences for the parent-child relationship. Even though parental rights are not irrevocably decided at a permanency hearing, the general purpose of these hearings "is to compel a resolution of the case so the child does not remain indefinitely in the system." *New Mexico Child Welfare Handbook, supra* § 19.1 (internal quotation marks omitted). As a result of these hearings, the district court adopts a permanency plan with a goal of reunification, adoption, or other permanent placement. *Id.* § 19.8.2. If the court does not adopt a permanency plan or make the reasonable efforts determination at the first hearing, a second hearing is held to decide which permanency plan is in the child's best interest and whether further efforts to reunite the family are required. *Id.* §§ 19.9.1, 20.1. Once the plan is changed to adoption or other permanent placement outside the home, however, a motion for termination of parental rights is inevitable. *See id.* § 19.8.2.

{30} Permanency hearings not only threaten substantial prejudice to parental rights, they bear a direct relation to the TPR hearing. The motion to terminate is based largely on conduct between the petition and the permanency hearing. *Watson,* 813 A.2d at 1106. Hence, the factual basis for termination is largely established at the permanency hearing, even though a formal TPR hearing follows. *See id.; see also Glen C. v. Superior Court,* 78 Cal.App.4th 570, 93 Cal. Rptr.2d 103, 111 (2000) (observing that "[t]he critical decision regarding parental rights will be made at the dispositional or review hearing, that is, that the minor cannot be returned home and that reunification efforts should not be pursued") (internal quotation marks and citation omitted)).[1] Given the statutory and federal timelines that compel quick resolution of the permanent placement

decision, once services are withdrawn and an adoption plan is adopted, the course is set for termination, even though reunification is still theoretically possible.

{31} Permanency hearings might also impact vital statutory rights. At the first hearing, there is a parental presumption; the presumption shifts to adoption at the second hearing. Depending on their compliance with the treatment plan, a parent might avoid the loss of parental rights at either hearing by having the case dismissed and the child returned to them. If an immediate return home is not recommended, parents can invoke the discretion of the district court to continue the reunification plan, so long as the child can be returned home in the near future. Parents can also request additional services or contact with the child to improve their chances for reunification. On the downside, parents risk the loss of any further assistance from CYFD and loss of their child if the plan is changed to adoption. A loss of services and a change of plans from reunification without an opportunity to hold the State to its burden or defend at this early stage is likely to be prejudicial to a parent.

{32} We emphasize that unlike a criminal case, the parents and the State share an interest in informed decisions regarding the parent-child relationship. *Santosky,* 455 U.S. at 760–61, 102 S.Ct. 1388. In addition to the parent's strong liberty interest, the State has an equally strong interest in protecting the child's welfare. *Lorena R.,* 1999–NMCA–035, ¶ 19, 126 N.M. 670, 974 P.2d 164. The interest in an accurate and just decision is, of course, strongest at the TPR hearing stage where the State seeks to destroy the parent-child relationship. *See Lassiter,* 452 U.S. at 27, 101 S.Ct. 2153; *see also Mafin M.,* 2003–NMSC–015, ¶ 18, 133 N.M. 827, 70 P.3d 1266 (requiring the State to conduct proceedings with "scrupulous fairness" to the parents when it seeks to sever the legal relationship of a parent and child). But, permanency hearings determine the direction of the proceedings and can increase the risk that the natural family will be de-

---

1. Although California has a somewhat different procedure for TPR hearings than New Mexico, we suspect the court's observation is effectively the same for many parents facing a termination of parental rights hearings in New Mexico.

stroyed. Thus, there is a strong shared interest in an accurate, appropriate decision at the permanency stage as well.

{33} Nonetheless, we are mindful that the "privilege of presence is not guaranteed when presence would be useless, or the benefit but a shadow." *Stincer,* 482 U.S. at 745, 107 S.Ct. 2658 (internal quotation marks and citation omitted). A parent has a compelling right to be present only "if his [or her] presence would contribute to the fairness of the procedure." *Id.* Thus, a fundamental right to be present exists only when prejudice to a parent's liberty interest might be avoided if the parent is present or where their presence might be beneficial or useful to their defense. *See id.; Coleman,* 399 U.S. at 9, 90 S.Ct. 1999. We believe, as a general matter, notice and the opportunity to participate in a permanency hearing would contribute to the overall fairness of the procedure by giving parents an opportunity to present their side of the story, prepare a defense if termination is in the offing, or avoid the TPR hearing altogether by having the case dismissed. *See Stella P.,* 1999–NMCA–100, ¶¶ 17–19, 127 N.M. 699, 986 P.2d 495 (indicating that parents have a fundamental right to defend against a proposed TPR). Effective counsel might also expose weaknesses in the State's case and cross examination could be useful as an impeachment tool. Testimony from the parents regarding their efforts to rehabilitate might influence the court's decision where credibility or veracity is at issue. *Cf. Vanessa C.,* 2000–NMCA–025, ¶ 19, 128 N.M. 701, 997 P.2d 833 (finding mother's due process rights were not violated, in part, because oral testimony was unnecessary to the court's decision on the futility issue at the judicial review hearing). The parents might also invoke the discretion of the district court to obtain additional services or visitation or to reinstate contact with the children to increase their chances of reunification.

{34} These opportunities can be particularly important because termination proceedings are largely based on the parent's conduct from the time the child is taken into custody until the court decides further assistance to the parent is futile. *Watson,* 813 A.2d at 1106. If parents are not afforded an early opportunity to defend against charges of abuse and neglect before the end stage, termination may very well be a foregone conclusion. *See id.* (concluding that the outcome is almost inevitable if an indigent parent does not have appointed counsel until petition to terminate has been filed). In light of the foregoing, we hold that as a general matter, parents have a due process right to fair notice and an opportunity for meaningful participation at the permanency stage, including the right to present evidence and cross examine witnesses, when their presence or additional safeguards would be useful or beneficial to their defense. *See Lorena R.,* 1999–NMCA–035, ¶ 25, 126 N.M. 670, 974 P.2d 164 (holding incarcerated parents have right to meaningful participation in TPR hearing).

{35} Nonetheless, we are mindful that the TPR hearing is the final checkpoint for parental rights in these proceedings. In *Vanessa C.,* we held that the failure to take formal testimony from witnesses at the judicial review stage did not deprive the mother of a fair trial. 2000–NMCA–025, ¶¶ 11, 19, 128 N.M. 701, 997 P.2d 833. We reasoned that the TPR hearing corroborated or clarified the issues addressed at the review hearing, and the mother had an opportunity to testify. Although she had notice and an opportunity to defend at the review hearing, the mother's live testimony was not required because the court relied on written documentation, and her only risk was in her expectation of assistance, which she had obtained on her own. *See id.* ¶¶ 10, 14, 17–19. Because the statutory scheme is unitary in nature, the process due at each stage should be evaluated in light of the process received throughout the proceedings. *See City of Albuquerque v. Chavez,* 1998–NMSC–033, ¶¶ 9, 14, 125 N.M. 809, 965 P.2d 928. With these principles in mind we address the issue of whether Mother was denied due process in the proceedings below.

**MOTHER WAS NOT DENIED DUE PROCESS UNDER THE MATHEWS TEST**

{36} Although we have determined that there generally exists a due pro-

cess right to notice and a meaningful opportunity to participate in the permanency hearings, we must now assess whether Mother's due process rights were violated under the facts and circumstances of her case. We apply a de novo standard of review to answer the question of whether a parent was afforded due process in abuse and neglect proceedings. *See Mafin M.,* 2003–NMSC–015, ¶ 17, 133 N.M. 827, 70 P.3d 1266.

{37}   Due process is not an abstract or static principle "unrelated to time, place and circumstances[;]" it is a flexible right that "calls for such procedural protections as the particular situation demands." *Mathews,* 424 U.S. at 334, 96 S.Ct. 893 (internal quotation marks and citation omitted); *Stella P.,* 1999–NMCA–100, ¶ 15, 127 N.M. 699, 986 P.2d 495. The guiding principles in a due process analysis are the rights of the parties and the interests at stake. *Anne McD.,* 2000–NMCA–020, ¶ 17, 128 N.M. 618, 995 P.2d 1060. Thus, when evaluating a claim that a party was denied due process, "[w]e employ the balancing test articulated [by the Supreme Court] in *Mathews." Mafin M.,* 2003–NMSC–015, ¶ 19, 133 N.M. 827, 70 P.3d 1266. "The *Mathews* test requires the weighing of Mother's interest; the risk to Mother of an erroneous deprivation through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and the government's interest." *Id.* As we have stated, Mother has a strong interest in raising her children. *Id.* ¶ 20. The State has an equally compelling interest in preserving and promoting the welfare of the children. *Lorena R.,* 1999–NMCA–035, ¶ 19, 126 N.M. 670, 974 P.2d 164. Thus, our inquiry focuses on the second factor; "whether the procedures used increased the risk of an erroneous deprivation of [Mother's] interest and whether additional safeguards would eliminate or lower that risk." *Anne McD.,* 2000–NMCA–020, ¶ 24, 128 N.M. 618, 995 P.2d 1060. Our determination does not depend on a showing that Mother would have succeeded if she was present at the perma-

nency hearings or if they were held at an earlier time. *Loudermill,* 470 U.S. at 544, 105 S.Ct. 1487. Mother need only demonstrate that there is a reasonable likelihood that the outcome *might* have been different.[2] *See id.*

{38}   The crux of Mother's claim is that her absence from both hearings and her inability to consult with counsel prior to the second hearing, increased the risk of an erroneous decision at the permanency hearing, and also increased the risk at the TPR hearing by interfering with her ability to avoid termination and improve her chances of reunification early on in the proceedings. More specifically, she argues that the risk of error was increased by her inability to: (1) present and cross examine witnesses or otherwise mount a defense at the permanency hearings, (2) invoke the court's discretion to obtain services and reinstate visitation or contact with the children to improve her chances of reunification, (3) demonstrate her efforts to fulfill her parental obligations while she was incarcerated, and (4) give the court an opportunity to evaluate her sincerity. Mother argues that her window of opportunity to avoid termination was effectively lost by the time of the pretrial conference when termination was imminent. She urges that the risk could have been reduced if the court had disciplined or removed counsel when it became apparent that he could not secure her presence at the first permanency hearing. The question for this Court then is whether Mother's absence from the permanency hearings substantially increased the risk of an erroneous deprivation through the decision to change the plan to adoption or, ultimately, terminate parental rights, and whether disciplining or removing counsel from the case to ensure her presence at an earlier time might have changed these decisions.

{39}   As we have stated, there is a substantial relation between the permanency hearings and the TPR hearing. The critical decision at the permanency stage is the proposed permanent placement of the child.

---

2.  In this regard, our analysis is different from a harmless error analysis which is an "outcome-based search for actual prejudice," rather than an interest analysis under *Mathews* that looks to whether the error produced an unjustifiable risk of an erroneous decision. *D.M. v. Div. of Family & Youth Servs.,* 995 P.2d 205, 218 (Alaska 2000) (Bryner, J., dissenting).

This decision often turns on the parent's compliance with the treatment plan and whether additional efforts by CYFD would be useful. If the parent is not making progress and further efforts would be futile, the permanent plan changes to adoption, and the motion for TPR soon follows. Termination can be avoided in some cases if a parent can demonstrate reasonable efforts and progress or request additional assistance at these hearings. In such cases, the bare essentials of due process can be critical. However, under the circumstances of this case, we find Mother's arguments regarding the importance of her presence at the permanency hearings unpersuasive.

{40} Mother theorizes that the risk of an erroneous decision increased because she did not have the opportunity to present evidence or cross examine witnesses at the permanency hearing. Yet, she has not identified any witnesses or substantive evidence to support her claim that the adoption plan or TPR might have been avoided had these additional procedures been available. Most critically, Mother had a full opportunity to present evidence and cross examine witnesses at the TPR hearing; she testified extensively over three days and cross examined the two social workers who testified on behalf of CYFD, and she concedes that there was evidence to support each of the court's findings. Yet, these findings are substantially the same facts that were in the record at the permanency hearings, and we fail to see how she could have defended against them differently then.

{41} It is also unlikely that the risk of error increased because she was unable to obtain additional services. Although this may be true in the abstract, the district court here was effectively powerless to order any treatment programs or services for Mother, even if she was present to request them. The record indicates that services are not available to federal prisoners until they are transferred to a federal facility. Mother was in federal custody at the Sandoval County and Santa Fe County jails during these entire proceedings. So far as we can determine, she was unable to participate in any programs that could have been initiated, regardless of what the district court ordered.

{42} Moreover, Mother did avail herself of services in jail and the district court was aware of her efforts to rehabilitate well before the first setting in August 2001. The social worker's report which was submitted for the judicial review hearing on July 24, 2001, indicates that as of March 2001 Mother had completed her GED, learned computer skills, and was studying English. Counsel also informed the district court of Mother's efforts at the second permanency hearing in April 2002 and Mother supplemented and documented this information at the pretrial conference in May. Mother also testified extensively about her accomplishments and goals at the TPR hearing. While her efforts are admirable, unfortunately, all the efforts and sincerity in the world could not alter the harsh reality of her long-term incarceration and inability to care for her children within the required time period.

{43} We also find it unlikely that the outcome would have been different if Mother had been present to request visitation. The district court's standing order was to allow supervised visitation at CYFD's discretion. The record reflects that Mother had one visit with the children in jail but that visitation was rescinded because the children did not want to see her. Mother also had supervised telephone contact with the children between February and March 2001, but that was discontinued because of the increasingly negative effect it had on the two children who participated and because the oldest child did not want to speak with her.

{44} Further, as early as the September 18, 2001, permanency hearing, the social worker who personally met with Mother in jail advised the district court that Mother wanted to visit her children, but that visits were logistically difficult and potentially adverse to their best interest at that time. The children were in three separate foster homes: one in Taos, two in Santa Fe, and one in Moriarty. The two older boys did not want to visit Mother and displayed significant behavioral problems. The ten year-old girl, who did want to visit Mother, was in treatment foster care because of sexual abuse

issues and it was believed that it would be detrimental to her stability to visit Mother at that time. The baby was environmentally at risk for developmental delay when he was removed from Mother's home, requiring speech and other specialized therapy. Although the social worker conceded that visits with the baby could be arranged, she advised the district court that Mother was a stranger to him and he had bonded with his foster mother. Both counsel and CYFD brought Mother's desire to resume contact with her children and her opposition to relinquishment to the attention of the district court again at the January 2002 permanency hearing. Ultimately, however, even though the court approved written contact and ordered CYFD to reassess visitation at the pretrial conference, it was Mother's incarceration that made reunification impossible, not her absence from the permanency hearings.

{45} In balancing the interests and assessing the risks, we are also mindful of the child's interest in a timely and permanent placement. *See Mafin M.*, 2003–NMSC–015, ¶ 24, 133 N.M. 827, 70 P.3d 1266. In terms of placement, "best interests" is interpreted as solutions that are not detrimental or harmful to the child; not necessarily the best choice. *Joe R.*, 1997–NMSC–038, ¶ 28, 123 N.M. 711, 945 P.2d 76. Prolonged uncertainty and instability is particularly detrimental to the child. Thus, it is critical for the district court to make a timely decision regarding placement. *Anne McD.*, 2000–NMCA–020, ¶ 40, 128 N.M. 618, 995 P.2d 1060. The children in this case had a pressing need for permanency given the family history.

{46} Consequently, no matter what her defense, or what services she received, or efforts she made, or sincerity she had, the overwhelming obstacle in this case for Mother was that the children would be in foster care for well over five years until she could be available to care for them, with no guarantees that placement with Mother after her release would be in their best interest. This impediment, compounded by the poor parenting history, a four year absence due to a past incarceration, the marked privation of the children when they were taken into CYFD

custody, and the prospect of deportation after her release, made the risk of error due to her absence minimal. The fact is Mother could not take the children in August 2001 or even in July 2002, and she would not be able to take them at any time in the near future.

{47} For all of the reasons indicated above, we conclude that there would be little, if any, value in disciplining or even removing counsel as Mother advocates. The facts in this case sealed the family's fate, not Mother's presence or absence at the permanency hearings. Accordingly, we find no due process violation under the circumstances of this case.

{48} Nevertheless, we have grave concerns over the conduct of counsel in the proceedings below. Due process encompasses a parent's Sixth Amendment right to effective assistance of counsel at abuse and neglect proceedings. *See Vanessa C.*, 2000–NMCA–025, ¶ 32, 128 N.M. 701, 997 P.2d 833; *see also Patterson v. LeMaster*, 2001–NMSC–013, ¶ 16, 130 N.M. 179, 21 P.3d 1032 ("The purpose of guaranteeing effective assistance of counsel is to ensure fairness throughout the course of [the proceedings]."). Although Mother chose not to pursue an ineffective assistance claim on appeal, there is no disagreement that counsels' role in the proceedings below was a travesty; even counsel admitted that they had done nothing for their clients. It cannot be over emphasized that counsel must be a zealous advocate for his client, including making reasonable efforts to locate and facilitate their attendance at neglect and abuse proceedings, "despite opposition, obstruction or personal inconvenience." *See Stella P.*, 1999–NMCA–100, ¶ 30, 127 N.M. 699, 986 P.2d 495 (internal quotation marks and citation omitted); *accord Rosa R.*, 1999–NMCA–141, ¶ 16, 128 N.M. 304, 992 P.2d 317; *see also* Rule 16–103 NMRA 2004, ABA Comment; *New Mexico Child Welfare Handbook, supra* § 5.3. Holding counsel to a reasonable standard of practice promotes accuracy and better advocacy by both sides. *In re Termination of Parental Rights of James W.H.*, 115 N.M. 256, 258, 849 P.2d 1079, 1081 (Ct.App.1993).

{49} Both counsel for Mother and Father knew by August 2001 that the only way to

secure their clients' release was to file a motion for habeas corpus. The record is void of any reasonable explanation for their failure to do so for nine months, long after the second permanency hearing was concluded, despite counsel's representations that CYFD had given him contact information for the federal marshal in August 2001 and that a United States attorney had sent him a thirteen page paper describing how to get a federal prisoner out in September 2001. Moreover, Mother's counsel admits that he never so much as talked to Mother until just prior to the second permanency hearing in April 2002, one year after his appointment as her counsel, and, even more egregiously, that he allowed Father's counsel to make representations on her behalf.

{50} It is also incumbent on the State to ensure that scrupulously fair procedures are followed when it interferes with a parent's right to raise their children. *Lorena R.,* 1999–NMCA–035, ¶ 19, 126 N.M. 670, 974 P.2d 164. When a child has been taken away from the parents and into the State's custody, both CYFD and the court have a constitutional duty to ensure that a parent's due process rights are protected at each stage of the proceedings that lead up to and include termination of those rights. "[W]hen notice is a person's due, process which is a mere gesture is not due process." *Ronald A.,* 110 N.M. at 454, 797 P.2d at 243 (alteration in original) (internal quotation marks and citation omitted). The State must exert every effort to ensure that they have provided full and fair notice, "reasonably calculated, *under all the circumstances,* to apprise [parents] of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 456, 797 P.2d at 245 (emphasis in original) (internal quotation marks and citation omitted).

{51} Although CYFD did provide notice to counsel, they were well aware that counsel was not relaying that information to Mother and that counsel was having difficulty in even locating her. The record indicates that CYFD knew where Mother was at most relevant times and met with her in jail at least twice, yet there is no indication that CYFD made any effort to notify her directly of the hearings, disclose her whereabouts to counsel, or assist in securing her presence at the hearing, beyond the mere disclosure of a telephone number and contact person. A constitutional duty does not end simply because notice is given to opposing counsel, where the party charged with giving that notice has reason to believe that the notice is effectively inadequate. CYFD had an affirmative duty to make reasonable efforts to ensure that parents have actual notice of the hearings and an opportunity to attend. While we do not expect CYFD to act as Mother's counsel, we remind counsel that their role as an attorney for CYFD is analogous to the role of prosecuting attorneys. The prosecutor's "obligation is to protect not only the public interest but also the rights of the accused." *Id.* (internal quotation marks and citation omitted). Similarly, CYFD "must seek not only to protect the children involved; they must see to it also that the parents are dealt with in scrupulous fairness." *Id.*

{52} In the final analysis, however, it is the district court that is charged with protecting a parent's due process rights. *Id.* The district court has an affirmative duty to ensure the parents due process rights are protected from the initiation of abuse and neglect proceedings, not just at the end. *See Rosa R.,* 1999–NMCA–141, ¶ 12, 128 N.M. 304, 992 P.2d 317 (holding the court has responsibility to inquire whether mother waived her due process right to be present at TPR hearing). It was insufficient for the court to merely continue the permanency hearing so that the parents could attend. The district court was alerted to a potential problem with counsel as early as the periodic review in July 2001 when the parents failed to appear for that hearing. Yet the district court did nothing to alter the status quo until it admonished counsel at the April 2002 permanency hearing. The district court may not assume a passive role in any of these proceedings. Due process requires the district court to inquire explicitly and on the record the reasons for a parent's absence from these hearings. *See Stella P.,* 1999–NMCA–100, ¶ 21, 127 N.M. 699, 986 P.2d 495. At minimum, the district court must

assess what reasonable efforts were made to arrange for the parents to be present and what corrective measures counsel intends to employ to facilitate their presence in the future. If the court is not satisfied, it may utilize its contempt powers. Rule 10–113(D) NMRA 2004. Without inquiry and follow through, the fundamental interest of the parents and the best interests of the child, as well as legislative command, are simply ignored. Parties are not required to "move heaven and earth" to notify parents and arrange for their participation in these proceedings, but they must make reasonable efforts to do so to comply with due process. *See Rosa R.,* 1999–NMCA–141, ¶ 17, 128 N.M. 304, 992 P.2d 317.

## SUFFICIENCY OF EVIDENCE AT THE INITIAL PERMANENCY HEARING

{53} Lastly, to the extent Mother argues that the district court improperly found the parental presumption was sufficiently rebutted by CYFD at the first permanency hearing based solely on the judicial notice it took of her incarceration, we disagree. Mother correctly points out that incarceration by itself is an insufficient reason to terminate custody. *Joe R.,* 1997–NMSC–038, ¶ 11, 123 N.M. 711, 945 P.2d 76. However, we disagree with her assumption that incarceration cannot be the sole legal ground for changing a permanency plan. As we have stated, "[t]he purpose of permanency hearings . . . is to compel a resolution of the case so the child does not remain indefinitely 'in the system.'" *New Mexico Child Welfare Handbook, supra* § 19.1. Under timelines imposed by state and federal law, parents do not have an unlimited period of time to be available for their children. *See Hughes v. Div. of Family Servs.,* 836 A.2d, 498, 505 (Del.2003) (en banc); *Patricia H.,* 2002–NMCA–061, ¶ 26, 132 N.M. 299, 47 P.3d 859. If an incarcerated parent is unable to take the children, a reunification plan can be maintained only if they will be released in the near future or the children can be placed with relatives or other substitute care provider. *See* § 32A–4–25.1(C), (G) (providing that the court can order the child to remain in the custody of CYFD with a reunification plan for not more than six months). If the parent will not be available within a reasonable time, and there are no substitute care providers, the court must change the permanency plan to adoption or other permanent placement. *See id.* 32A–4–25.1(F). Courts must also recognize that the child's best interest is paramount throughout the proceedings. *See Mafin M.,* 2003–NMSC–015, ¶ 24, 133 N.M. 827, 70 P.3d 1266; *Lorena R.,* 1999–NMCA–035, ¶ 30, 126 N.M. 670, 974 P.2d 164. Thus, the district court need not place children in a legal holding pattern, while waiting for the parent to resolve the issues that caused their children to be deemed neglected or abused. *Mafin M.,* 2003–NMSC–015, ¶ 24, 133 N.M. 827, 70 P.3d 1266.

{54} Even at the initial permanency hearing in January 2002 the district court noted and counsel stipulated that neither parent could receive their children. Father was expected to be incarcerated for another sixteen months, and Mother, in fact received a nine year sentence—five years in prison and four years of probation. At that time, the children were already in foster homes for seventeen months, well beyond the statutory time limit to file for termination of parental rights, and they would be in foster care for at least three years before they could be returned to their parents, barring deportation and assuming they were fit. § 32A–4–29(K). Moreover, the biological fathers of the three older children could not be located, and the only suitable relative placement was unsuccessful. The bare fact was that the district court had no option but to change the permanency plan to adoption because no one was available to care for the children.

{55} In light of the foregoing, we affirm the decision of the district court below and find no due process violation.

{56} **IT IS SO ORDERED.**

ALARID and KENNEDY, JJ., concur.