This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

### IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-39750

**STATE OF NEW MEXICO ex rel.
CHILDREN, YOUTH & FAMILIES
DEPARTMENT,**

 Petitioner-Appellee,

v.

**FELIX R.,**

 Respondent-Appellant,

and

**TASSIE T.,**

 Respondent,

**IN THE MATTER OF FELIX R. II,**

 Child.

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY
Lee A. Kirksey, District Judge**

Children, Youth & Families Department
Mary McQueeney, Acting Chief Children's Court Attorney
Robert Retherford, Children's Court Attorney
Santa Fe, NM

for Appellee

Susan C. Baker
El Prado, NM

for Appellant

Laura K. Castillo

Hobbs, NM

Guardian Ad Litem

**DECISION**

**WRAY, Judge.**

**{1}** Father Felix R. appeals the termination of his parental rights to Child. We affirm. Because the parties are familiar with the record and this is an expedited bench decision, we discuss the facts and proceedings that are necessary to our analysis of the issues presented.

**DISCUSSION**

**{2}** Father argues that (1) the Children, Youth and Families Department (the Department) failed to present sufficient evidence to support the termination; and (2) he was denied due process in the proceedings to terminate his parental rights. We address each argument in turn.

**I. Sufficiency of the Evidence**

**{3}** Father challenges the sufficiency of the evidence supporting the termination of his parental rights to Child. To terminate a parent's rights, the Department must establish by clear and convincing evidence that a child has been abused or neglected and that the "'causes of the neglect or abuse are unlikely to change in the foreseeable future, despite reasonable efforts by [the Department] to assist the parent in adjusting the conditions that render the parent unable to properly care for the child.'" *State ex rel. Child., Youth & Fams. Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 21, 132 N.M. 299, 47 P.3d 859 (emphasis omitted) (quoting NMSA 1978, § 32A-4-28(B)(2) (2005)). The Department must also "show that the best interests of the child are served by the termination of parental rights." *Id.*

**{4}** Father argues the district court erroneously found that (1) the Department made reasonable efforts to assist him; and (2) the causes and conditions that led to neglect were unlikely to change in the foreseeable future. We note that Father does not challenge the district court's findings that Child was neglected or that termination of his parental rights was in Child's best interests. We review the district court's findings to evaluate whether "viewing the evidence in the light most favorable to the [Department], the fact[-]finder could properly determine that the clear and convincing evidence standard was met." *State ex rel. Child., Youth & Fams. Dep't v. Keon H.*, 2018-NMSC-033, ¶ 38, 421 P.3d 814 (internal quotation marks and citation omitted). We first consider the evidence supporting the Department's efforts to assist Father.

**A. Reasonable Efforts to Assist Father**

**{5}**     "[W]hat constitutes reasonable efforts may vary with a number of factors, such as the level of cooperation demonstrated by the parent and the recalcitrance of the problems that render the parent unable to provide adequate parenting." *Id.* ¶ 41 (internal quotation marks and citation omitted). Reasonable efforts "may include individual, group, and family counseling, substance abuse treatment, mental health services, transportation, child care, and other therapeutic services." *Id.* (internal quotation marks and citation omitted). We consider the totality of the circumstances when reviewing the district court's determination of the Department's reasonable efforts*. See id.*

**{6}**     The district court found that the Department made reasonable, though "not Herculean, efforts" to assist Father. Specifically, the district court determined that Department communicated the case plan to Father (who was incarcerated out-of-state) and his prison caseworker, spoke with Father, and made Father aware of what the Department wanted him to do and what services were available to him. Father, the district court concluded, "simply did not take advantage of that." We agree that the totality of the circumstances demonstrate that the Department presented evidence that it made sufficiently reasonable efforts to assist Father.

**{7}**     In August 2019, the Department filed a petition alleging that Child was abused or neglected. In November, the Department sent Father the case plan, and April Sosa, the Department caseworker, followed up with a prison caseworker in December. At the next hearing, on December 17, 2019, Father confirmed for the district court that he received and understood the petition. Though the Department had not been able to review the case plan with him, Sosa reported that Father had responded to the Department with more information after he received the case plan. In January 2020, the Department reported that it had been in contact with Father's prison caseworker about available programs and that Father had written to Child. Father confirmed he had received the case plan, he had put in request forms for the classes, and the Department had contacted the prison about the classes.

**{8}**     By February, Sosa was no longer on the case and the new caseworker, Raquel Leyva, began in April. Leyva testified that she "got the run around" from the prison, but on June 3, 2020, she eventually was able to contact Father and review the case plan, which Father indicated he understood. After that, Leyva was in contact with Father at least once a month and bi-weekly in September and November. Leyva asked Father if he knew about available programs, and Father told Leyva that formerly available programs were shut down due to COVID. When they spoke, Leyva and Father talked about the case plan, and they tried to come up with an alternative, given the length of Father's incarceration until at least 2025. Leyva encouraged Father to put her and Child on his call list for supervised visits and asked why he was not in therapy. In addition to these direct efforts to assist Father, the Department investigated Father's recommended alternate placements for Child, though these individuals were not determined to be appropriate placements.

**{9}**     Father argues the district court's findings with respect to the Department's reasonable efforts were "blatantly erroneous" and highlights evidence that he maintains

establishes that the pandemic prevented the Department from making reasonable efforts. Father essentially asks us to reweigh the evidence and to credit his own testimony. On appeal, however, this Court may not "reweigh the evidence" or assess the credibility of witnesses. *Id.* ¶ 38. Instead, we defer to the district court's conclusions when witness testimony conflicts. *See id.* ¶ 51 (noting the Court's "duty to defer to the district court's conclusions" with regard to witness credibility). The evidence supports the district court's finding that the Department made sufficiently reasonable efforts to assist Father. *See id.* ¶ 43 ("[T]he Department's efforts, although imperfect, were reasonable.").

## B.    Causes and Conditions of Neglect Were Unlikely to Change

**{10}**    To determine whether the Department met its burden to establish that the causes and conditions of neglect were unlikely to change, we assess, given the parent's efforts and circumstances, whether the parent could "realistically be able to care for [the c]hild" in the foreseeable future. *Id.* ¶ 53. The "foreseeable future" is defined as "a reasonably definite time or within the near future." *Id.* (internal quotation marks and citation omitted). Father argues that the COVID-19 pandemic prevented him from having a meaningful opportunity to address the issues that resulted in Child's removal and the district court's findings to the contrary were "in error and must be reversed." The district court found, and the evidence supported, that Father did not take or request the classes required by the case plan before the pandemic-related shut downs, never engaged in individual counseling, and did not maintain a parental bond by consistently writing to Child or including Child on his call list for monitored visitation. Although Father did provide alternate placements for Child, they were either inappropriate or he made no effort to ensure his mother, one of his suggested alternative placements, responded and worked with the Department and out-of-state authorities. The district court correctly found that Child would be an adult, or would be within six months of adulthood, if Father were released from prison on parole at the earliest possible date in 2025.

**{11}**    Father nevertheless maintains he "was not given a reasonable opportunity to work his treatment plan." Father focuses on the classes that were not available in prison due to COVID, but does not explain or mention his failure to sign up before the pandemic, his disregard for individual therapy, or his scant efforts to maintain contact with Child. Father speculates that the Department failed to do its job when it did not place Child with his paternal grandmother, but when asked where the paternal grandmother has been during the process, Father stated simply, "I'm in prison, ma'am." The three individuals Father identified to watch over Child—his uncle, his mother, and a friend of the family—either were identified only a week before the termination hearing (uncle), would not respond (mother), or reported pending felonies (family friend). Father acknowledged that there was no reason to wait until Child was almost seventeen years old to find someone to be his parent.

**{12}**    The pandemic did not prevent Father from demonstrating that he could parent from prison in the foreseeable future. To the contrary, Father's broader failure to act—to consistently write or call Child, to reach out to alternative placements, to engage in

therapy—supported the district court's finding that the conditions and causes of neglect were unlikely to change in the foreseeable future.

## II.     Due Process

**{13}**     Father additionally contends that the COVID-19 pandemic resulted in a denial of due process, because services were unavailable in prison, he had insufficient time to work his treatment plan, and he could not attend certain hearings. Father acknowledges his due process arguments were not preserved in the district court and seeks review for "plain error." The State appears to argue that if we review Father's due process claim at all, we should review for fundamental error. We review the merits of Father's due process claim because a failure to permit a parent to defend against the termination of parental rights is fundamental error. *See State ex rel. Child., Youth & Fams. Dep't v. Rosa R.*, 1999-NMCA-141, ¶ 7, 128 N.M. 304, 992 P.2d 317. Our review of this claim is de novo. *Id.* ¶ 6.

**{14}**     As Father notes, we apply the three-part test enunciated in *Matthews v. Eldridge*, 424 U.S. 319 (1976), to determine whether a parent received constitutionally sufficient process during an abuse and neglect proceeding. *See State ex rel. Child., Youth & Fams. Dep't v. Robert E.*, 1999-NMCA-035, ¶¶ 21, 23, 126 N.M. 670, 974 P.2d 164 (describing and applying the *Matthews* test). The first and third factors of the *Matthews* test—analyzing the parent's and the State's interest in the proceedings—are well established in the present context and not at issue, and as a result, we focus on the second factor. *See State ex rel. Child., Youth & Fams. Dep't v. Stella P.*, 1999-NMCA-100, ¶ 16, 127 N.M. 699, 986 P.2d 495 (focusing on the second factor). The second factor weighs whether the procedures afforded Father regarding his opportunity to work the case plan placed him "at risk of erroneous deprivation of [his] interest in the trial[,]" as well as "the probable value, if any, of additional or substitute procedural safeguards." *Id.* (internal quotation marks and citation omitted). Father argues that the unavailable services, the insufficient time, and his absence from certain hearings constituted inadequate procedures that violated his right to due process. We consider each argument.

**{15}**     Father contends that he was denied due process because he had "only two months prior to COVID-19 closures to work his treatment plan" and services were suspended in the prison due to COVID. We disagree, because the timeline was not so truncated as Father suggests and the termination resulted from Father's failure to engage and participate, not the actual lack of classes. The Department served the petition on Father on October 4, 2019, and delivered the case plan to him in November 2019. In court, on January 7, 2020, Father acknowledged that he had received and understood the plan, indicated an intention to work on it, and was writing to Child. Father did not sign up for the services when they were available, between November (when the Department sent the case plan) and March 2020 (when the pandemic resulted in lockdowns). Nor did Father utilize the few resources that were available, including individual therapy and letters and calls with Child. When confronted with prison records that did not show Father signing up for any classes, Father speculated

that perhaps the requests had not yet been received. We conclude that the suspension of prison services in the present case caused little risk to Father of erroneous deprivation and that little probable value would have been gained from the provision of additional services. *See id.* (weighing the risk of erroneous deprivation against the probable value of additional safeguards).

**{16}** Father also argues that COVID prevented him from attending certain hearings, which he maintains violated his due process right to be heard and to raise a defense to termination. A parent has a due-process right to attend "proceedings that threaten a parent's liberty interest in raising their child or provide an early opportunity to prepare and mount a defense or affect vital statutory rights." *State ex rel. Child., Youth & Fams. Dep't v. Maria C.*, 2004-NMCA-083, ¶ 28, 136 N.M. 53, 94 P.3d 796. Nevertheless, "a fundamental right to be present exists only when prejudice to a parent's liberty interest might be avoided if the parent is present or where their presence might be beneficial or useful to their defense." *Id.* ¶ 33. We therefore assess the facts and circumstances of this case to determine whether Father's absence from hearings "substantially increased the risk of an erroneous deprivation through the decision to change the plan to adoption or, ultimately, terminate parental rights[.]" *See id.* ¶¶ 36, 38.

**{17}** Child was taken into custody on August 20, 2019. Father did not attend the hearings held September 5, 2019, or September 24, 2019, because he was not served with the petition until October 4, 2019. At the November 12, 2019 hearing, Father's attorney noted difficulties arranging for Father's presence at the hearing and asked for a resetting, which the district court granted. Father appeared at the December 17, 2019 hearing, at which the district court advised Father of his rights, adjudicated Child neglected as to Father, and adopted the case plan. Father also appeared at and participated in the January 7, 2019 hearing. Father was not present at either the April 20, 2020, or the June 22, 2020 hearings, because of COVID restrictions and incorrectly submitted paperwork. The Department filed the petition for termination of parental rights on July 10, 2020. Father was also unable to attend the next hearing, on August 24, 2020, and the district court continued the termination of parental rights hearing scheduled for August 31, 2020, but proceeded with the permanency hearing that day. Father attended the follow-up hearing on September 21, 2020, during which Leyva reviewed the contents of the most recent report and noted she had spoken briefly with Father about recent occurrences with Child. The Department confirmed that termination of parental rights was the plan and requested to move forward with that hearing. Father attended all three termination settings, two of which were continued when Father's phone time ended.

**{18}** We discern no risk of erroneous deprivation arising from Father's absence for the pre-adjudication hearings in September and November 2019, well before the COVID lockdowns. Father attended the adjudicatory hearing and contributed to the January 2020 proceedings. Father missed hearings in April, June, and August. Father broadly states that he was denied "the opportunity to defend against the allegations, to confront and cross-examine witnesses, and to present evidence on his behalf." He does not, however, identify the witnesses or evidence he could have offered that would support

his position that termination might have been avoided had he been present at these hearings. *See id.* ¶ 40 (requiring the parent who was not present for hearings to support a claim that "the adoption plan or [termination of parental rights] might have been avoided had these additional procedures been available"). Father participated in the termination hearings, and our review of the record demonstrates that the evidence presented at the termination hearings was largely the same as the information offered at the other hearings he could not attend. *See id.* (explaining that the parents fully participated in the termination hearings, which resulted in findings that were "substantially the same facts that were in the record at the permanency hearings"). Just as in *Maria C.*, we fail to see how Father could have defended against this evidence differently in the earlier hearings than he did at the termination hearings. *See id.* It was therefore unlikely that Father's absence from the earlier hearings increased the risk of erroneous deprivation.

**{19}**  In considering Father's right to be present at critical stages of the abuse and neglect proceedings, *see id.* ¶ 28, we must also be "mindful of [C]hild's interest in a timely and permanent placement." *Id.* ¶ 45. Timely permanency decisions are critical, because "[p]rolonged uncertainty and instability is particularly detrimental to the child." *Id.* Having weighed the interests, we conclude that Father's due process rights were not violated under these circumstances when pretermination of parental rights hearings proceeded without him attending. *Id.* ¶ 47 (finding no due process violation under the circumstances because "[t]he facts in this case sealed the family's fate, not [the parent's] presence or absence at the permanency hearings").

## CONCLUSION

**{20}**  We conclude the evidence supported the district court's decision and Father's due process rights were not violated by the proceedings. Accordingly, we affirm.

**{21}   IT IS SO ORDERED.**

**KATHERINE A. WRAY, Judge**

**WE CONCUR:**

**JENNIFER L. ATTREP, Judge**

**MEGAN P. DUFFY, Judge**